[No. 84739-8.   En Banc.]
Argued May 5, 2011.     Decided February 23, 2012.

THE STATE OF WASHINGTON, *Petitioner*, v. BOBBY RAY THOMPSON, *Respondent*.

*Mark K. Roe, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for petitioner.

*David B. Koch* (of *Nielsen, Broman & Koch PLLC*), for respondent.

*Diane M. Meyers* and *Rochelle L. Haller* on behalf of the Innocence Network, amicus curiae.

*Suzanne Lee Elliott* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

¶1 ALEXANDER, J.[*] — We granted the State's petition to review a decision of the Court of Appeals in which that court reversed the trial court's denial of Bobby Ray Thompson's motion for postconviction deoxyribonucleic acid (DNA) testing. In reaching its decision, the Court of Appeals held that the trial court erred in considering a postarrest statement that Thompson made to the police, but which was not admitted in evidence. We affirm the Court of Appeals.

I

¶2 On April 13, 1995, a woman identified in the record as J.S. went with friends to a bar in Lynnwood, Washington. During the course of the evening and the early morning hours of the following day J.S. consumed approximately 12 alcoholic drinks. Close to the bar's closing time, a man whom J.S. had met earlier in the evening approached J.S. After a brief conversation J.S. agreed to go with him to an "after hours" party at a hotel room across the street from the bar. When they arrived at the room, no one else was present. This caused J.S. to tell the man that she wanted to return to her friends at the bar. J.S. said that the man refused to let her leave and repeatedly beat and raped her. J.S. indicated at trial that she lost consciousness numerous times as the man hit and kicked her in the head and body, raped her several times, and attempted to strangle and

---

[*] Justice Gerry L. Alexander is serving as a justice pro tempore of the Supreme Court Pursuant to Washington Constitution article IV, section 2(a).

drown her in the hotel room bathtub. J.S. testified, additionally, that she did not remember what occurred between the final time she lost consciousness and her awakening at the hospital. She also stated that she had no memory of talking to or seeing anyone at the hotel, except for the man who raped her. Finally, she indicated that she did not remember speaking to police officers at the hospital.

¶3 Other testimony at trial revealed that in the early morning hours of April 14, 1995, a hotel desk clerk had reported to the Lynnwood Police Department that a noisy dispute was taking place at the hotel. After arriving at the scene, police officers witnessed Thompson "pushing" J.S. out of the room where the rape of J.S. is alleged to have occurred. Verbatim Report of Proceedings (July 24, 1995) (VRP) at 39, 40. Hotel records showed that the room was registered to Thompson. One of the responding police officers testified that J.S. was crying, shaking, and "yelling hysterically that he'd beat her and he was going to kill her." *Id.* at 40-41. The police officers arrested Thompson at the scene. Shortly thereafter, the officers entered the hotel room and observed blood on the bed, floor, walls, and in the bathroom.

¶4 J.S. was taken to the hospital, where a full rape examination was conducted, including vaginal swabs. The neurosurgeon who treated J.S., Dr. Eric Kohler, testified that J.S. was suffering memory problems, her eyes and ear canals were swollen shut, and there was extensive bruising and swelling of her head and body. Dr. Kohler also indicated that because J.S. reported that the rapist beat her with his fists, he would expect the rapist to have sustained injuries to his hands. There is no evidence that Thompson's fists showed any signs that he administered a beating on the night of his arrest.

¶5 A day after the attack, J.S. told a detective she probably could not identify her attacker because she had seen him in the bar "[j]ust for a brief second," and the hotel room was dark. *Id.* at 81. J.S. also later indicated to an

investigator for the defendant that the rapist might have had blond hair, did not have facial hair, and was between 5'7" and 5'8" tall. The record discloses that Thompson has black hair, is 6'3" tall, and had a moustache at the time of his arrest.

¶6 The Washington State Patrol Crime Lab received evidence for testing, including bed sheets and a bloody washcloth from the hotel room as well as swabs from the rape kit and blood vials from Thompson and J.S. A forensic scientist testified that although the blood on the sheets may have come from J.S., it could not have come from Thompson. One bloodstain on the sheet contained semen, but the forensic scientist was unable to determine the donor. He also found semen in the vaginal swabs from the rape kit. He did not, however, perform DNA tests to determine the donor of the semen, indicating that there was insufficient time to do so prior to trial.

¶7 On the morning of his arrest, Thompson gave a statement to the police in which he indicated that he and the victim had engaged in consensual sexual intercourse. *See* Br. of Resp't, App. B.

¶8 The State charged Thompson in Snohomish County Superior Court with first degree rape. Prior to trial, the trial court granted an unopposed defense motion to preclude admission of Thompson's statement to the police that he and the victim had engaged in consensual sexual intercourse. Pursuant to the parties' stipulation, the trial court indicated that the statement could be admitted for impeachment purposes if Thompson testified at trial. Thompson did not testify at trial and, consequently, his statement was not offered or admitted in evidence. A jury found Thompson guilty of first degree rape, and the trial court sentenced him to 280 months in prison. The judgment and sentence became final in 1997.

¶9 Approximately nine years later, Thompson, acting pro se, filed a motion in Snohomish County Superior Court for postconviction DNA testing of all of the evidence collected

in the rape case. In his motion, Thompson stated that he "claims actual innocence." Clerk's Papers (CP) at 91. After the State informed the trial court that the evidence had been destroyed in 2001, it denied Thompson's motion.

¶10 Thompson appealed that decision to the Court of Appeals, Division One, which dismissed the appeal as moot based on the trial court's determination that all testable evidence had been destroyed. *State v. Thompson*, 155 Wn. App. 294, 298, 229 P.3d 901 (2010). Thompson later discovered that the testable evidence had not been destroyed and, thus, was available for testing. Based on this information, the State moved to recall the mandate issued by the Court of Appeals. The Court of Appeals granted the motion and stayed Thompson's appeal pending this court's decision in *State v. Riofta*, 166 Wn.2d 358, 209 P.3d 467 (2009). *Thompson*, 155 Wn. App. at 298. After *Riofta* was decided, the Court of Appeals reversed the trial court's order denying Thompson's motion for DNA testing and remanded with instructions to the trial court to enter an order permitting the testing. *Id.* at 304. The State petitioned for this court's review, which we granted. *State v. Thompson*, 170 Wn.2d 1005, 245 P.3d 227 (2010).

II

¶11 Like the Court of Appeals, we review a trial court's decision on a motion for postconviction DNA testing for abuse of discretion. *Riofta*, 166 Wn.2d at 370. A trial court abuses its discretion when an order is manifestly unreasonable or based on untenable grounds. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). "A discretionary decision 'is based "on untenable grounds" or made "for untenable reasons" if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Id.* (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995))).

¶12 Pursuant to the provisions of RCW 10.73.170(2), a motion for postconviction DNA testing shall

(a) State that:

(i) The court ruled that DNA testing did not meet acceptable scientific standards; or

(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or

(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;

(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime.

Subsection (3) of RCW 10.73.170 provides that the motion shall be granted if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis."

¶13 The trial court set forth three reasons for denying Thompson's motion for postconviction DNA testing: (1) the evidence had been destroyed, so there was nothing to test; (2) the defendant failed to satisfy RCW 10.73.170(2)(a) because he did not show that "DNA technology was unavailable at the time of trial"; and (3) the defendant did not show a "likelihood that the DNA evidence would demonstrate the defendant's innocence." CP at 7-8. The Court of Appeals rejected the trial court's reasoning and reversed and remanded for an order permitting DNA testing under RCW 10.73.170.

¶14 The only issue before us is whether the trial court erred when it considered evidence available to the State at the time of trial but not admitted at trial. This question implicates the trial court's third reason for denying Thompson's motion, which was based on subsection (3) of RCW 10.73.170. The State argues that DNA testing would not demonstrate Thompson's innocence because Thompson made a statement to the police shortly after his arrest in which he said that he and the victim had engaged in consensual

sexual intercourse. Suppl. Br. of Pet'r at 8. The State points out that "DNA testing might provide evidence on whether one person had sexual intercourse with another, but it cannot show whether that intercourse was consensual." *Id.* It asserts, therefore, that DNA testing would not demonstrate the likelihood that Thompson was innocent on a more probable than not basis.[1]

¶15 The Court of Appeals rejected the State's argument, concluding in a footnote that the State could not rely on Thompson's statement because it "was not admitted at trial and . . . the 'more probable than not' innocence determination is made by considering only evidence that was admitted at trial." *Thompson*, 155 Wn. App. at 304 n.26. In reaching this conclusion, the Court of Appeals relied on the standard we set forth in *Riofta*. In that case, a person wearing a hat emerged from a car that had several people inside, fired gunshots at the victim, and dropped the hat on the sidewalk while fleeing the scene. It was later determined that the car had been stolen and that the hat belonged to the car's owner. Thus, more than one person could have worn the hat prior to the shooting, including the car owner and the other passengers in the car at the time of the shooting. Because people other than the shooter could have left DNA in the hat, we determined that the defendant was not entitled to test the hat for DNA.

¶16 In that case, we articulated the standard for postconviction DNA testing as follows: "[A] court must look to whether, viewed in light of all of the *evidence presented at trial* or newly discovered, favorable DNA test results would

---

[1] Amici curiae the Innocence Network and the Washington Association of Criminal Defense Lawyers correctly point out that the "objectivity and precision of modern DNA testing has been credited with revealing that, at times, innocent people can and do confess to crimes they did not commit." Br. of Amici at 3; *see also In re Pers. Restraint of Bradford*, 140 Wn. App. 124, 127-32, 165 P.3d 31 (2007) (DNA evidence exonerated Bradford 10 years after he falsely confessed to burglary and rape); Mark Morey, *The Nightmare Continues, Even After Acquittal on Rape Charge*, YAKIMA HERALD-REPUBLIC (Nov. 17, 2010), *available at* http://www.yakima-herald.com/stories/2010/11/17/the-nightmare-continues-even-after-acquittal-on-rape-charge.

raise the likelihood that the person is innocent on a more probable than not basis." *Riofta*, 166 Wn.2d at 367 (emphasis added) (citing RCW 10.73.170(3)). The State contends that to the extent our decision in *Riofta* suggested there are restrictions on the evidence that can be offered in a postconviction motion for DNA testing, "that language was dicta" because in *Riofta* the State did not offer any evidence beyond that submitted at trial. Pet. for Review at 7. Here, however, our concern reaches beyond the fact that the evidence was neither presented at trial nor newly discovered.[2]

¶17 In our view, it is significant that even though the State knew about Thompson's statement at the time of trial, it stipulated that the statement would not be admitted in evidence unless Thompson testified. Because of the parties' pretrial stipulation, a CrR 3.5 hearing was never conducted to determine the admissibility of the statement. Nonetheless, the dissent relies on the unadmitted statement for the truth of the matter asserted therein, despite the fact that the veracity of the statement was never tested. Indeed, the dissent seemingly uses the defendant's failure to repudiate the statement against him. *See* dissent at 890 ("Critically, [Thompson] has never repudiated the truth of the factual statements contained in his sworn statement."). *Riofta* makes clear that the procedure for ordering DNA testing under RCW 10.73.170 is not akin to retrying the case. But if a statement that was not admitted at trial can be considered, then the door opens to a replay of the full range of other "facts" that the parties, for various, often

---

[2] Amici suggest that to "preclude DNA testing solely because the defendant tendered a confession contradicts the intent of Washington's DNA testing statute." Br. of Amici at 4. The reasons for false confessions are numerous and include: "pathological desire for attention or self-punishment; feelings of guilt over prior transgressions; delusions; or a desire to protect the real perpetrator." *Id.* at 5 (citing Saul M. Kassin, *The Psychology of Confessions*, 4 Ann. Rev. Law Soc. Sci. 193, 195 (2008)). Additionally, "false confessions are made by innocent, but vulnerable (*e.g.*, anxious, fatigued or confused) suspects who come to believe that they must have committed the crime." *Id.* at 5-6 (citing Saul M. Kassin, *The Psychology of Confession Evidence*, 52 Am. Psychologist 221 (1997)).

strategic reasons, chose to not offer into evidence. We must be careful to keep the focus on the statutory requirements of RCW 10.73.170 and not unduly expand the inquiry. We, therefore, decline to adopt the State's approach, which would permit a court to deny DNA testing on the basis of evidence that was not admitted at trial that the State affirmatively agreed to keep from the jury unless Thompson testified.

¶18 Because we conclude that the Court of Appeals properly determined that the trial court erred in considering Thompson's statement, we agree with the Court of Appeals' rejection of the trial court's third reason for denying Thompson's motion. The trial court stated that the third reason it denied Thompson's motion was that there " 'is no likelihood that the DNA evidence would demonstrate the defendant's innocence.' " *Thompson*, 155 Wn. App. at 301. The Court of Appeals relied on our reasoning in *Riofta* to explain the standard for determining innocence on a more probable than not basis, which was that the " 'statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator.' " *Id.* at 302 (quoting *Riofta*, 166 Wn.2d at 367-68). The Court of Appeals distinguished the facts here from *Riofta* and instead analogized them to a case it had recently decided, *State v. Gray*, 151 Wn. App. 762, 215 P.3d 961 (2009). *Thompson*, 155 Wn. App. at 303. In *Gray*, that court held that the defendant, who had been convicted of rape and attempted rape of two teenage girls, was entitled to DNA testing because if the test results identified the donor of the semen, it would establish Gray's innocence on a more probable than not basis. This is so because there was only one perpetrator of the attacks and, therefore, there would only be one source of DNA. This scenario is distinguishable from *Riofta*, where the hat may have been worn by other people prior to the shooting, making it possible that DNA could be left at the crime scene

by someone other than the shooter. The Court of Appeals, therefore, properly deemed *Gray*, where DNA testing was permitted, to be factually closer to this case than *Riofta*, where testing was not permitted.

¶19 The record here shows that the victim had intercourse with only one person on the night of the attack, the rapist. If DNA test results should conclusively exclude Thompson as the source of the collected semen, it is more probable than not that his innocence would be established, particularly in light of the weakness of the victim's identification of Thompson as her attacker. As noted above, J.S. was unsure of her ability to identify her attacker and her tentative description of her attacker does not match Thompson's appearance. In sum, we agree with the Court of Appeals that the motion should have been granted because Thompson "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).[3]

¶20 Although the issue is not before us, we note that the Court of Appeals also properly determined that the second reason set forth by the trial court for denying the motion, that the defendant failed to show that DNA technology was unavailable prior to Thompson's trial, is not sustainable. We say that because proof that DNA technology was unavailable at the time of trial is not procedurally required by RCW 10.73.170(2)(a). In *Riofta*, we stated that the plain meaning of RCW 10.73.170 is that evidence is to be tested when it has the potential to produce "new information." *Riofta*, 166 Wn.2d at 365. We explained that the "plain meaning of the statute allows DNA testing based on

---

[3] We recognize this case presents troubling facts, namely that Thompson was seen pushing J.S. out of his hotel room on the morning the rape allegedly occurred. There may be an explanation—other than that Thompson was the rapist—for this fact, but that inquiry is not ours to make. Our role is to determine whether the trial court erred in concluding that Thompson failed to meet the statutory requirements set forth in RCW 10.73.170. As we explain, it did.

either advances in technology *or* the potential to produce significant new information." *Id.* We stated that

> [r]ead as a whole, the statute provides a means for a convicted person to produce DNA evidence that the original fact finder did not consider, whether because of an adverse court ruling, inferior technology, or the decision of the prosecutor and defense counsel not to seek DNA testing prior to trial.

*Id.* at 366.

¶21 Here, the vaginal swabs were not tested for DNA, even though the forensic scientist explained in his testimony that semen was present on the swabs. If the semen can be tested, the results of the tests will constitute "significant new information" under RCW 10.73.170(2)(a)(iii) because the test results will reveal whether Thompson was the donor of the semen, which will either exculpate or inculpate him as the rapist. This case presents the scenario we contemplated in *Riofta*, in that the DNA evidence from the vaginal swabs was unknown to the fact finder at trial but will now provide significant new information.

¶22 In conclusion, we hold that the Court of Appeals correctly determined that the trial court improperly relied on Thompson's unadmitted statement in denying the motion for postconviction DNA testing. We therefore affirm the Court of Appeals.

C. JOHNSON, CHAMBERS, OWENS, and STEPHENS, JJ., concur.

¶23 MADSEN, C.J. (dissenting) — The only issue on which review was granted is whether, in deciding the defendant's postconviction motion for DNA (deoxyribonucleic acid) testing, the trial court properly considered a statement that the defendant made to police after his arrest. Under RCW 10.73.170, the proper focus of a court deciding a postconviction motion for DNA testing is on whether the defendant has made the required showing of actual innocence.

This means establishing on a more probable than not basis that the wrong person was convicted.

¶24 Unfortunately, in deciding whether the statutory standard for *posttrial* DNA testing is met, the majority applies rules for admissibility *at trial*. But the statutory inquiry is not a criminal trial governed by the same constitutional and evidentiary standards that apply at trial to determine whether the defendant is legally guilty. Instead, to decide whether the defendant has sufficiently shown actual innocence to justify postconviction DNA testing, a trial court should consider reliable evidence that the defendant committed the acts constituting the criminal offense because this evidence is highly relevant to the inquiry into actual innocence.

¶25 Contrary to the majority's belief, our decision in *State v. Riofta*, 166 Wn.2d 358, 209 P.3d 467 (2009), does not limit the inquiry only to evidence that was either admitted at trial or is newly discovered. Indeed, the issue whether available evidence that was not admitted or admissible at trial may be considered was never before the court in *Riofta*. Moreover, we made it absolutely clear in *Riofta* that the focus of a postconviction motion for DNA testing is on whether the defendant is actually innocent, and it cannot seriously be questioned that evidence that was not admitted at trial can be relevant to this question.

¶26 Contrary to the majority, it does not "unduly expand" (majority at 874) the statutory inquiry to consider reliable evidence at the very core of RCW 10.73.170. But the majority would have the court disregard important evidence on the issue of actual innocence, not because it is unreliable or irrelevant but because it was not admitted at trial—a requirement found nowhere in the statute—and even though the evidence is a reliable statement that the defendant himself stipulated he voluntarily made and which establishes that he is not innocent of rape.

¶27 The majority also paints a picture of uncertain identification, evidently to show the necessity of a DNA

test. But the record shows that the victim identified the defendant as the rapist-assailant just as he was physically pushing her out of the room where the rape occurred, *immediately* after the assault, in the presence of numerous police officers, followed by an in-court identification. Whatever may be the limit of eyewitness identification, it is not relevant here.

¶28 I would hold that reliable, relevant evidence bearing on whether the right person was convicted may be considered for the limited purpose of deciding a motion for postconviction DNA testing under RCW 10.73.170, provided that the defendant has the opportunity to challenge the evidence. This standard is satisfied by the defendant's statement at issue in this case. The trial court did not abuse its discretion by considering the statement.

## Discussion

### Additional Facts

¶29 Before turning to the question of what evidence may be considered when ruling on a postconviction motion for DNA testing, additional facts from the record are relevant to the question whether the trial court abused its discretion in denying the defendant's motion. First, the evidence at trial on the issue of the defendant's identity as the person who assaulted J.S. is much stronger than indicated by the majority, showing that the State did not have the weak case the majority describes. Second, the defendant's statement that is at issue was excluded at trial based on a stipulation by the parties. Insofar as its relevance to the statutory inquiry under RCW 10.73.170 is concerned, there has never been any dispute about the reliability of the statement. Third, additional facts relating to forensic testing but not acknowledged by the majority are set out here because whether a defendant seeks DNA testing at trial is a matter that may be considered when deciding whether to grant a postconviction motion for DNA testing. The following addi-

tional facts complete the factual background relevant and necessary for resolving the issue in this case.

a. The evidence of identity

¶30 Very early in the morning on April 14, 1995, about 3:00 a.m., Lynwood City Police Officer Ronald Erue was dispatched to a hotel to respond to a 911 call reporting a "physical" domestic dispute. 1 Verbatim Report of Proceedings (VRP) (July 24, 1995) at 35-36. He was the first to arrive. Room 111, where the disturbance had occurred, was just around the corner from the hotel clerk's desk. The door was closed. After additional officers arrived, the officers heard a door open, looked down the hallway, and saw a man and woman leaving room 111. The man was the defendant, Bobby Ray Thompson, and the woman was J.S., the victim. The defendant "was forcing the female out the door and out the emergency exit." *Id.* at 39. "[H]e had a hold of her and physically pushed her out the door." *Id.* "It appeared he was forcing her out the door. . . . He was right behind her physically forcing her out the door." *Id.* at 40. Officer Erue asked them to stop, but Thompson just looked at Erue and continued to push J.S. out the door.[4]

¶31 Erue testified that J.S. "got about halfway out the door and turned, saw me, and started yelling hysterically that he'd beat her and he was going to kill her." *Id.* at 40-41. The officer saw that J.S. had "been beat pretty severely." *Id.* at 41.[5] "She kept screaming he had beat her, that he was going to kill her. She was crying, shaking." *Id.* Officer Erue also testified that she said that "when she would not put out, he beat her and raped her." *Id.* at 54.

¶32 Lynnwood City Police Officer David Byrd was also dispatched to the hotel in response to the report of a

---

[4] The defendant did not dispute at trial that he was the man attempting to push J.S. out the door but did contest the State's evidence that he was the person who had beaten and raped her.

[5] Officer Erue described her condition, including the fact that she was bleeding from her eyes, something he had never seen before. She was also bleeding from the nose and mouth.

domestic disturbance in room 111. He similarly described seeing J.S. and Thompson, with Thompson "shoving [J.S.] out the emergency exit door." VRP (July 25, 1995) at 39. Officer Byrd affirmatively identified Thompson in court as being the man he saw outside room 111. He described seeing only Thompson being detained outside room 111 and testified that when he did a protective sweep of the hotel room there was no one else in the room.

¶33 Lynnwood City Police Officer Steven Rider also testified that he responded to the hotel and along with Officers Byrd and Erue approached room 111. He testified to Thompson trying to push J.S. out the "back door." *Id.* at 53-54. Officer Rider affirmatively identified Thompson in court as the person who was pushing J.S. out the door. Rider testified that he placed Thompson under arrest.

¶34 The hotel clerk on duty at the time identified Thompson in court as the person she had seen the police officers remove from the hotel.

¶35 J.S. identified Thompson in court as the man who assaulted her. She testified that he approached her when she was out with friends at a bar and invited her to join him at an "after hours" party at the hotel across the street. 1 VRP at 60-62. She testified that she went with him, but when she discovered there was no one else in the room, told him she had to leave. She said that he responded by hitting her and knocking her unconscious. She testified that she was raped numerous times and continually beaten and knocked unconscious and that he tried to drown her. J.S. testified that there was no one else in the hotel room.

¶36 On cross-examination, J.S. was questioned about a description of her attacker that she had provided during an interview with a defense investigator. (That interview occurred on June 26, 1995, about two and one-half months after the assault. Confidential Investigative Memo to Att'y at 1 (July 3, 1995).) Clerk's Papers (CP) at 53. Defense counsel cross-examined her about having described the attacker as being about five foot seven to five foot eight

inches tall with shoulder-length blond hair. J.S. testified that she had said to the investigator that she thought he was that tall but was not sure of his height, adding that she is only four feet, nine inches tall, and "so everybody seems pretty tall to me." 1 VRP at 80-81, 83. She said she "couldn't be sure" and did not "know how tall he was." *Id.* at 83. J.S. testified that she also had told the investigator that she was not sure of the color of his hair. When she was asked about having said the attacker had no facial hair, she denied having said that and instead said that she told the investigator that she was not sure. She did say that she had told a detective the day after the attack that she probably could not identify the attacker.

¶37 But regardless of uncertainty she may have expressed when verbally describing her assailant, J.S. positively identified Thompson to police officers *immediately* after the attack and she positively identified him in court as the man who raped and beat her.

¶38 In summary, the evidence on identification includes: J.S.'s at-the-scene identification to police officers of Thompson as the man who had raped, beaten, and tried to kill her;[6] her testimony that he was the only one in the hotel room when she was raped and beaten; her positive in-court identification of Thompson as the rapist;[7] police officers' in-court identifications of Thompson as the man they saw

---

[6] Officer Rider prepared an additional narrative report, in which he said that he heard J.S. say that Thompson was her attacker. His report states that as other officers went to J.S.'s aid, he stayed with Thompson, but could hear J.S. "screaming that Thompson had tried to kill her." CP at 85.

[7] Inaccuracy of eyewitness identification is often a reason given for why innocent people have been convicted, and thus inferentially one reason why a postconviction process for obtaining DNA testing is important. *See, e.g.*, Steven A. Krieger, *Why Our Justice System Convicts Innocent People, and the Challenges Faced by Innocence Projects Trying to Exonerate Them*, 14 NEW CRIM. L. REV. 333, 341 (2011) (explaining that inaccurate eyewitness identifications contributed to the convictions in more than 80 percent of documented cases of DNA exonerations). However, in the present case the victim was contemporaneously being physically pushed by the individual she immediately identified as having raped, beaten, and tried to kill her, at the very moment she identified him to police officers as her assailant.

trying to push J.S. out an exit door near the room where she was raped and whom she immediately identified as her attacker; the officers' testimony that there was no one else on the scene; that, upon prompt inspection of the room, no one else was found in it; and the hotel clerk's identification of Thompson as the person she saw the police remove from the hotel. Thompson was positively identified at the time of the assault as J.S.'s assailant and as the only person in the hotel room with her.

b. Exclusion of the defendant's statement

¶39 During preliminary proceedings, the defendant's attorney started to say "there [are] some statements that Mr. Thompson made" and the court interrupted, "Are those the ones that are purportedly contained in the affidavit of probable cause?" 1 VRP at 18. Counsel agreed, advised the court that there had been no CrR 3.5 hearing, and then counsel began to say "so as I understand it." *Id.* At this point, the prosecuting attorney interrupted and advised the court he did not intend to use the statement other than for purposes of cross-examination. The parties then *stipulated* that Thompson's statement was *voluntary* and that it was admissible for purposes of possible impeachment of the defendant if he testified. *Expressly* basing its decision on the parties' *agreed stipulation*, the court granted the motion to limit admissibility to this purpose. There is no evidence suggesting that the statement would have been ruled inadmissible at a CrR 3.5 hearing, such as for lack of *Miranda* warnings.[8] Indeed, the stipulation on the statement's voluntariness and use supports the opposite conclusion.

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In his additional narrative report, Officer Rider stated that after he arrested Thompson, he "advised Thompson of his constitutional rights which he said he understood because he had been arrested before." CP at 85 (capitalization omitted). The report continued, "I asked him if, understanding his rights, he would like to waive them and talk to me about what happened. He said he did." *Id.* Thompson then made the statement at issue.

c. Forensic testing at trial

¶40 In *Riofta* we determined that whether a defendant requests DNA testing at trial may be considered in deciding a postconviction motion for DNA testing. Therefore, a further description of the facts regarding forensic testing for trial is relevant and in the context here, highly significant.

¶41 Greg Frank, a forensic scientist with the Washington State Patrol laboratory in Marysville, testified at trial to a three-month backlog of cases requiring testing at the Marysville laboratory at the time the bodily fluid evidence in this case was received. He stated that by the time he began testing the blood and other samples, it was too late to send samples on to the state lab in Seattle where DNA testing was done and still have the DNA testing complete by the time of trial in accordance with speedy trial rights.

¶42 The defense did not seek a continuance for the purpose of DNA testing. However, the defense *did* move for a continuance for the purpose of trying to obtain other evidence that allegedly would implicate another person as the individual who assaulted J.S. (a motion that the trial court denied as being too "iffy," untimely, and of marginal relevance, 1 VRP at 16).

¶43 During closing argument, defense counsel referred to the fact that there was no DNA evidence, saying that being overworked was an unacceptable excuse for DNA testing not having been completed, and described the State's failure to produce DNA evidence as "lack of evidence" that the defendant was guilty. VRP at 100. The prosecuting attorney responded that he wished he did have DNA evidence. He explained to the jury that there were limitations due to the state budget for staff, the time needed to conduct the testing, and the defendant's speedy trial rights.[9]

---

[9] The majority also relies rather heavily on the defendant's claim that had he been J.S.'s attacker, there would have been evidence at trial that his hands were

¶44 With these additional facts, I turn to the issue before us.

Postconviction Motion for DNA Testing; Evidence

¶45 Relying on a single sentence in *Riofta*, the majority says that under RCW 10.73.170 the only evidence that can be considered is evidence that was admitted at trial and newly discovered evidence. This both misreads and misapplies *Riofta*. Quite simply, there was never any issue in *Riofta* about whether evidence that was not presented to the jury but available at the time of trial may be considered when deciding a postconviction motion for DNA testing. We never held that the evidence that can be considered is so unduly restricted. To the contrary, the primary emphasis in *Riofta* is on the requirement that a defendant show actual innocence.

¶46 We emphasized that the legislature used the word "innocence" "to restrict the availability of postconviction DNA testing to a limited class of extraordinary cases where the results could exonerate a person who was wrongly convicted of a crime." *Riofta*, 166 Wn.2d at 369 n.4. "RCW 10.73.170 is not aimed at ensuring a defendant had a fair trial. Its purpose is to provide a remedy for those who were wrongly convicted *despite* receiving a fair trial." *Id.* RCW 10.73.170 "asks a defendant to show a reasonable probability of his innocence before requiring State resources to be expended on a test." *Id.* at 370. Accordingly, the focus is on the defendant's *innocence. Id.* "Innocent" means that the State convicted the wrong person. *Id.* at 369 n.4 (citing *Sawyer v. Whitley*, 505 U.S. 333, 340, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992)).

---

damaged, but there was none. The absence of such evidence, the defendant asserts, supports his claim of actual innocence. The problem with this argument is that it presumes a conclusion when no evidence on the condition of his hands, one way or the other, was presented at trial. I note that in his additional narrative report, Officer Rider referred to cuts and scrapes on Thompson's body at the time he was arrested. CP at 86.

¶47 When reliable evidence available at the time of the motion shows that the State did not convict the wrong person, the purpose of the statute is not furthered by granting the motion.[10] On the contrary, the statutory goal is served by permitting a trial court to consider relevant, reliable evidence such as the defendant's statement here. In fact, if there is relevant, reliable evidence bearing on the issue of the defendant's actual innocence, the failure to consider it may result in a significantly distorted view of the defendant's innocence (or lack thereof). This is not what the legislature intended.

¶48 The majority says, though, that we must "focus on the statutory requirements" and "not unduly expand the inquiry." Majority at 874. I completely agree, but am at a loss as to how considering reliable evidence directly bearing on the issue of actual innocence is an undue expansion of the inquiry into actual innocence. I also agree that the postconviction inquiry is not a retrial, *see id.*; indeed, this is why the standards and rules of admissibility applicable at a criminal trial should not strictly control. The statute's focus on actual innocence should guide us in deciding what evidence may properly be considered when deciding whether the defendant has made a sufficient showing of innocence.

¶49 Simply stated, a motion under RCW 10.73.170 does not occur in a criminal trial. Rather, RCW 10.73.170 provides a species of postconviction relief. *Riofta,* 166 Wn.2d at 370. A defendant seeking postconviction relief is in a "significantly different situation than a person facing trial." *Id.* at 369. Available rights are limited. In *District Attorney's*

---

[10] DNA test results can be exculpatory, inconclusive, or inculpatory, and in some cases may provide exclusionary results sufficient "enough to undermine the validity of the conviction." Melissa Duncan, Comment, *Finding a Constitutional Right to Access DNA Evidence: Postconviction*, 51 S. Texas L. Rev. 519, 523 (2009). (Contrary to the title of this comment, the United States Supreme Court held that there is no constitutional right to DNA testing in *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009).)

*Office for Third Judicial District v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009), the United States Supreme Court explained why different rights exist during postconviction proceedings than exist in a criminal trial:

> A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins*, 506 U.S. 390, 399, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). "Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." [*Conn. Bd. of Pardons v.*] *Dumschat*, [452 U.S. 458,] 464, 101 S. Ct. 2460[, 69 L. Ed. 2d 158 (1981)] (internal quotation marks and alterations omitted).
>
> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. "[W]hen a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume." *Pennsylvania v. Finley*, 481 U.S. 551, 559, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987). [The] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that [the individual] has already been found guilty at a fair trial, and has only a limited interest in postconviction relief.

*Id.* at 68-69 (some alterations in original).

¶50 Thus, in *Osborne*, the Court held there is no freestanding substantive due process right to postconviction DNA testing. *Id.* at 72-74. The Court said that a state may create a limited liberty interest in demonstrating innocence with new evidence, but this right has to be analyzed in light of the fact that the defendant has already been convicted. *Id.* at 68-70.

¶51 The Court also held that there is no procedural due process right requiring the State, in postconviction proceedings where a defendant seeks DNA evidence, to disclose

material exculpatory evidence; the obligation recognized in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), requiring a prosecutor to disclose material exculpatory evidence to the defendant before trial does not apply in postconviction proceedings. *Osborne*, 557 U.S. at 68-69; *Twillie v. Foulk*, 360 F. App'x 301, 304 (3d Cir. 2010) (unpublished opinion).

¶52 This court, too, recognizes that different rights exist, and different analyses apply, depending upon whether the proceeding is the criminal trial itself or some other proceeding. In particular, admissibility of evidence at trial is not necessarily a prerequisite to its consideration in proceedings other than a criminal trial. For example, sentencing judges have traditionally had discretion in the sources and types of evidence that may be considered when determining a defendant's sentence. *State v. Strauss*, 119 Wn.2d 401, 418, 832 P.2d 78 (1992); *State v. Herzog*, 112 Wn.2d 419, 424, 771 P.2d 739 (1989). At sentencing, the rules of evidence do not strictly apply. *Strauss*, 119 Wn.2d at 418. Rather, evidence admitted at a sentencing hearing must meet due process requirements that the evidence be reliable and the defendant be given the opportunity to refute it. *Id.* at 418-19.

¶53 Reliability is also key to considering certain otherwise inadmissible evidence in postconviction proceedings where, although an individual is guaranteed some rights, they are not the same rights guaranteed in a criminal prosecution. *State v. Abd-Rahmaan*, 154 Wn.2d 280, 288-89, 111 P.3d 1157 (2005) (postconviction sentence modification hearings are not criminal prosecutions and therefore "flexible" due process requirements govern confrontation). *State v. Dahl*, 139 Wn.2d 678, 683, 990 P.2d 396 (1999), is instructive. There, the issue was whether hearsay evidence was properly admitted in a defendant's hearing on revocation of a special sentencing alternative sentence. Because the hearing was not a criminal proceeding and because the "minimal" due process rights that are required in order to confront and

cross-examine witnesses are not absolute, we applied a balancing analysis, weighing reliability of the hearsay evidence against the difficulty that would be involved in procuring a live witness. *Id.* at 686.

¶54 Neither a trial court deciding a postconviction motion for DNA testing nor an appellate court reviewing a trial court's decision on the motion is considering evidence for the purpose of determining whether the defendant is guilty or not guilty. Instead, as stated, the issue is whether a claim of actual innocence is sufficient to justify the expenditure of costs, resources, and time necessary to provide DNA testing.[11] On this issue, relevant, reliable evidence should be considered in deciding the question of actual innocence.

¶55 Another court has faced the issue whether statements that were inadmissible or not admitted at trial can be considered in deciding whether to grant a postconviction request for DNA testing. The Texas Criminal Court of Appeals held that the defendant's statement and accomplices' statements were properly considered by the trial court ruling on a postconviction request for DNA testing. In *Ex Parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011), the defendant, who was denied postconviction DNA testing, argued that the trial court improperly considered both his own "statement to police—because it was purportedly taken in violation of his right to remain silent—[and] his accomplices' statements—because they were neither admissible nor admitted at trial." (Footnote omitted.) The

---

[11] In 2006, a North Carolina Department of Justice cost study determined that the average cost of analyzing a rape kit in a state crime laboratory was $568.96, and in a private laboratory, after processing costs are added, $681.03. Justin Brooks & Alexander Simpson, *Blood Sugar Sex Magik: A Review of Postconviction DNA Testing Statutes and Legislative Recommendations*, 59 Drake L. Rev. 799, 828 (2011). Federal law provides for federal funds to help defray costs in states where the DNA testing statutes conform to federal requirements. Justice for All Act of 2004, Pub. L. No. 108-405, § 413, 118 Stat. 2260, 2285 (2004). Generally, the standard required for federal funds is that there is a reasonable probability the defendant would not have been convicted if DNA testing had been available and conducted at the time of trial.

defendant claimed that the trial court therefore improperly denied his request for appointed counsel to assist in a motion for forensic DNA testing, as authorized by state law if a trial court determined that the defendant established reasonable grounds to file a motion for DNA testing.

¶56 The Texas appellate court rejected the argument. The court explained that "[a]lthough evidence offered against a defendant at a criminal trial and challenged on constitutional grounds must be admissible to give adequate protection to the values that exclusionary rules are designed to serve," a postconviction proceeding addressing a person's request for DNA testing "is not a 'criminal trial' " but is instead "an independent, collateral inquiry" where the exclusionary rule has no place. *Id.* at 892-93. The court observed that the state "legislature ha[d] placed no barriers to the type of relevant and reliable information that the trial judge may consider" and, while the information the court considers must be reliable, "it need not be admissible or previously admitted at trial." *Id.* at 893.

¶57 The Texas court's analysis and its conclusion that reliability is the linchpin for consideration of the statements in *Gutierrez* are similar to our own postconviction decisions holding that constitutional protections and evidentiary standards are not the same as in the criminal trial and in certain circumstances reliable evidence may be considered even though not admissible at trial.

¶58 Moreover, just as was true of the Texas law at issue, our state legislature has placed no restrictions on the type of evidence that may be considered in deciding whether a defendant has established that DNA testing, along with other evidence, will show innocence on a more probable than not basis. Nothing in RCW 10.73.170 precludes consideration of relevant, reliable evidence that was available but not admitted at trial. This is entirely in keeping with the purpose of the statute to enable consideration of actual

innocence when deciding whether to grant the motion for DNA testing.[12]

¶59 A trial court ruling on a postconviction motion for DNA testing is not determining whether the defendant was guilty of the crime. The individual has already been convicted. *See* RCW 10.73.170(1) (authorizing a person in prison after being "convicted of a felony" to move for DNA testing). Because the issue is whether the defendant has made a sufficient showing of actual innocence, here the defendant's statement to police is highly relevant. It affirmatively shows that he is not actually innocent. As the majority says, majority at 875, only one person had sexual intercourse with the victim the night she was raped and beaten. In his statement, the defendant voluntarily stated that he had sexual intercourse with J.S., although he claimed it was consensual.

¶60 The statement is also reliable. As mentioned, at trial the defendant stipulated to voluntariness and he does not now make any claims to the contrary. Critically, he also has never repudiated the truth of the factual statements contained in his sworn statement, including the fact that he had sexual intercourse with J.S. He had no need or obligation to do so at trial, of course, but on this postconviction motion for DNA testing, where he must make an affirmative showing of innocence, his failure to counter the veracity of his admittedly voluntary statement is pertinent on the matter of reliability. Finally, he has presented no evidence that contradicts his admission that he had sexual intercourse with J.S.

¶61 The trial court properly considered the defendant's statement made to police after his arrest.

---

[12] The fact that a defendant continues to maintain innocence while requesting DNA testing does not mean that the defendant is actually innocent, of course. For unknown reasons that seem to defy logic, an individual may maintain innocence for years and then, when DNA testing is finally obtained, the test results match this individual who had maintained innocence. Krieger, *supra*, at 387-88 (noting this problem, and referring to one innocence "project admitted that eight of the twenty-five DNA tests the project conducted matched the individual professing innocence").

¶62  Based on all of the evidence before it, and contrary to the majority's conclusion, the trial court did not abuse its discretion when it denied the defendant's postconviction motion for DNA testing.[13]

¶63  In addition to the evidence of the defendant's statement, the trial court[14] was also presented with the evidence pertaining to the defendant's failure to request DNA testing at trial. Although not a per se bar to postconviction DNA testing, a court may take into account a defendant's failure to seek DNA testing at trial. *Riofta*, 166 Wn.2d at 366 n.1. RCW 10.73.170 "does not allow defendants to adopt a 'wait and see' approach. A defendant's failure to request DNA testing at trial of evidence he now claims to be exculpatory must be weighed against his claim of probable innocence unless circumstances exist to justify the failure." *Riofta*, 166 Wn.2d at 368 n.3.

¶64  Here, when making his postconviction motion for DNA testing, the defendant claimed that he had sought a continuance at trial to permit DNA testing. The State submitted transcripts from the trial record showing that this claim is false. Rather, as explained, the defendant sought a continuance in order to try to obtain evidence that another person allegedly committed the crime, specifically, a copy of a driver's license that purportedly would show

---

[13] The majority addresses the issue whether the defendant was required to show that DNA technology was unavailable at the time of trial. Majority at 876. Our grant of review was limited, however, to the issue whether the trial court properly considered the defendant's statement to the police. Order, *State v. Thompson*, No. 84739-8 (Nov. 3, 2010); *see* RAP 13.6; RAP 13.7(b). It is unfair, as well as in violation of our rules, to grant review on a limited issue, receive supplemental briefing only on that issue, and then address and decide an additional issue.

[14] As provided in RCW 10.73.170(1), the movant is to submit the motion for DNA testing to the court that entered the judgment of conviction. In this case, the same judge ruled on the motion as had presided at Thompson's criminal trial.

that its holder fit the description that the defense claimed J.S. had provided to the defense investigator.[15]

¶65 Given that at trial the defendant was willing to seek a continuance to obtain evidence that purportedly would have incriminated another individual, it is highly significant that the defendant did not seek a continuance for the purpose of DNA testing. If he believed that DNA testing would show that he was innocent, presumably he would have sought DNA tests that could have exonerated him or at least been exculpatory.[16] Yet, the defendant did not attempt to obtain DNA testing for trial. His failure to do so undercuts his claim that the evidence and DNA testing would establish a likelihood of innocence on a more probable than not basis. It strongly suggests that at trial he knew that DNA test results were unlikely, in fact, to have been favorable to his defense.

¶66 In light of the evidence, the trial court properly denied the postconviction motion for DNA testing. Not only is the failure to seek such testing at trial highly significant, Thompson's statement that he had sexual intercourse with J.S. is also extremely damaging to his motion because DNA testing could not differentiate between rape and consensual intercourse.[17] Thompson has not carried his burden under RCW 10.73.170(3) of showing that a DNA test would demonstrate innocence on a more probable than not basis.

Conclusion

¶67 The majority imposes an unjustified barrier to considering reliable evidence that is relevant to whether a

---

[15] Even at the time of the postconviction motion, however, the defendant presented no such additional evidence suggesting that another person actually committed the crime.

[16] By the time the rape in this case had occurred, DNA testing had been held admissible in criminal trials in this state. *See, e.g.*, *State v. Gentry*, 125 Wn.2d 570, 888 P.2d 1105 (1995) (filed on Jan. 6, 1995); *State v. Russell*, 125 Wn.2d 24, 882 P.2d 747 (1994); *State v. Kalakosky*, 121 Wn.2d 525, 852 P.2d 1064 (1993).

[17] It is possible that this is the reason why the defendant did not move for a continuance to obtain DNA testing at trial.

defendant's postconviction motion for DNA testing under RCW 10.73.170 should be granted. Neither the statute nor our decision in *Riofta* supports the majority's conclusion that only evidence admitted at trial or newly discovered may be considered when assessing a defendant's claim of innocence under the statute.

¶68 The statute's purpose is to authorize DNA testing where there is a likelihood, on a more probable than not basis, that the defendant is actually innocent. If reliable evidence is relevant to this issue, it should be considered. Otherwise, an inaccurate assessment of innocence may occur. I cannot agree with the majority's assertion that consideration of such evidence "unduly expands" the statutory inquiry; indeed, an admittedly voluntary statement that the defendant committed the acts constituting the crime, as in this case, goes to the very heart of the statutory inquiry.

¶69 *Riofta* never addressed the issue whether evidence that was available but not admitted at trial may be considered in deciding a motion under RCW 10.73.170. Rather, *Riofta* underscores the purpose of the statute to assess a defendant's showing of actual innocence, not to assess guilt under the standards that govern criminal trials.

¶70 The majority's narrow view of what may be considered also does not comport with principles governing postconviction proceedings, where the defendant's rights are not the same as at a criminal trial.

¶71 The statement that the defendant made to the police following his arrest the morning after the assault on J.S. is reliable and relevant evidence bearing on whether the defendant has made a sufficient showing of innocence. It was properly considered by the court when the court ruled on Thompson's motion for DNA testing. The court also properly considered the fact that the defendant did not seek such testing at trial although, at the same time, he did seek a continuance in order to try to obtain other evidence he asserted would be exculpatory. The parties presented argu-

ment on this point, and the State submitted part of the trial transcript to authenticate what had occurred at trial.

¶72 After considering the information urged by the defendant, his statement, and the circumstances surrounding forensic testing at trial, the trial court acted well within its discretion when it denied Thompson's postconviction motion for DNA testing.

¶73 For these reasons, I dissent. I would reverse the Court of Appeals and reinstate the trial court's ruling in this case.

FAIRHURST, J.M. JOHNSON, and WIGGINS, JJ., concur with MADSEN, C.J.