# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76073-4-I |
|  | ) |  |
| Respondent, | ) | DIVISION ONE |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ALFONSO V. SENIOR, JR., | ) | UNPUBLISHED |
|  | ) |  |
| Appellant. | ) | FILED: May 14, 2018 |
|  | ) |  |

Cox, J. — A defendant seeking postconviction DNA testing must show that a favorable DNA test result would demonstrate his innocence is more probable than not.[1] Because Alfonso Senior fails to meet this burden, the trial court did not abuse its discretion in denying his motion. We affirm.

One evening, Senior joined his brother, Antoine Senior, and their cousin, Robert Swaggerty, at the North Point Bar & Grill. Darrell Webster was also at the bar that evening, along with his friend, Charles Bullock, long time acquaintance Amie Hudson, and Pia Inkamp, with whom Webster had previously exchanged phone numbers.

Senior and Webster got into a shoving match outside the bar. A local tribal police officer arrived at the scene and broke up the dispute.

Antoine then asked Inkamp and her friend if they would like to have breakfast at his apartment. They agreed to discuss his proposition further at a

---

[1] RCW 10.73.170(3).

nearby gas station. Senior, Antoine, Swaggerty, Webster, Bullock, Hudson, and Inkamp all drove to the gas station.

Senior, Antoine, and Swaggerty arrived in an SUV. Senior remained by this vehicle while Antoine and Swaggerty went to speak to Inkamp. Webster and Bullock arrived shortly after. After a short verbal confrontation between Bullock and Senior, Senior shot Webster, who died. Senior, Antoine, and Swaggerty fled in the SUV.

During the investigation that followed, police recovered a fired bullet, a 9mm casing from a fired projectile, a 9mm casing from an unfired projectile, and watch fragments from the scene. In Antoine's apartment, police found Senior's identification card along with a pistol case and ammunition box, both for a 9mm pistol. Police arrested Senior, Antoine, and Swaggerty soon afterwards.

Police interviewed Antoine after the shooting. He repeatedly stated that he did not know who the shooter was, and that he had seen neither any shooting nor any gun.

The State charged Senior with second degree murder and unlawful possession of a firearm in the second degree.[2] A jury found him guilty of both crimes.[3] We previously affirmed these convictions on appeal.[4]

---

[2] State v. Senior and Senior, No. 67913-9-I, slip op. at 2 (Wash. Ct. App. Apr. 22, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/679139.pdf.

[3] Id.

[4] Id.

The State also charged Antoine with felony rendering assistance in the first degree and unlawful possession of a firearm. Antoine entered a North Carolina v. Alford[5] plea to both offenses.

In June 2016, Senior moved for postconviction DNA testing. He requested that the watch fragments be tested for DNA and fingerprints. He included a crime scene diagram and a declaration from Antoine with that motion. In his sworn declaration, Antoine testified that a person named Daz, not Senior, shot Webster.

Allegedly, Daz had been over at Antoine's house earlier that night, drinking and playing video games. From there, Antoine had left to go to a casino and Daz had gone to the North Point Bar and Grill. Antoine, with Senior, later joined Daz at the bar.

Daz, Antoine claimed, had been in a silver Volvo that arrived at the gas station shortly after Antoine arrived in the SUV. Antoine estimated that between 15 to 20 people were present at that time. Antoine explained how he got into a fight with Webster while Senior stood by the SUV. Daz purportedly then shot Webster and fled in the Volvo. Antoine fled in the SUV.

At some point after, Daz called Antoine to express anger that he had dropped his watch at the crime scene.

Senior also included with his motion certain police reports involving Antoine and the Volvo from 2014.

---

[5] 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

The State answered Senior's motion, attaching transcripts of Antoine's statements given after the shooting.

The trial court denied Senior's motion. It concluded that:

. . . .

> 3. The defendant has failed to explain why DNA testing of the identified items from the crime scene would be material to the identity of the perpetrator. There is no credible evidence that supports the conclusion that the absence of the defendant's DNA or the presence of another's DNA on these items would tend to establish that the defendant is innocent of murder or unlawful possession of a firearm.

> 4. Even presuming that the results of DNA testing of the identified items would be favorable to the defendant, this Court finds that such results would not demonstrate the defendant's innocence on a more probable than not basis.[6]

Senior unsuccessfully moved for reconsideration.

Senior now appeals.

## DNA TESTING

Senior argues through counsel and in his SAG that the trial court abused its discretion in denying his motion to have the watch fragments DNA tested. We disagree.

A defendant has no constitutional right to DNA testing.[7] But RCW 10.73.170 permits the defendant the statutory right to "seek DNA testing in order to establish their innocence."[8]

---

[6] Clerk's Papers at 58.

[7] State v. Crumpton, 181 Wn.2d 252, 258, 332 P.3d 448 (2014).

[8] Id.

The statute has procedural and substantive components. The parties do not dispute that Senior has met the statute's procedural requirements.

Under RCW 10.73.170(3), the convicted person must "show[] the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." "A court should look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis."[9] Thus, the defendant must "show a reasonable probability of his innocence before requiring State resources to be expended on a test."[10] In doing so, the court should be mindful that "there will always be strong evidence against a convicted individual since they were convicted of the crime beyond a reasonable doubt."[11] If the trial court finds that the defendant has met his burden, it must allow DNA testing.[12]

We review for abuse of discretion a trial court's ruling on a motion for postconviction DNA testing.[13] We do not review the trial court's credibility findings.[14]

---

[9] Id. at 260.

[10] State v. Riofta, 166 Wn.2d 358, 370, 209 P.3d 467 (2009).

[11] Crumpton, 181 Wn.2d at 262.

[12] Id. at 261-62.

[13] Id. at 257.

[14] In re Trust and Estate of Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

Numerous cases, discussed by Senior and the State, are illustrative. In all but one of these, rape defendants have moved for DNA testing to show the absence of their DNA in the evidence supporting conviction.[15]

These cases "involve[] weak identification evidence but otherwise had very strong physical and circumstantial evidence tying the convicted individual to the crime."[16] When "there was only one rapist and no other sexual activity, any DNA on the tested evidence would necessarily have to be the rapist's DNA."[17] Thus, when a "victim had intercourse with only one person on the night of the attack," then DNA test results excluding the convicted person, would more probably than not establish innocence.[18] In such circumstances, DNA results are "logically very persuasive."[19]

The other cited case, State v. Riofta[20] provides a contrasting illustration. Alexander Riofta had been convicted of first-degree assault with a firearm.[21] The crime occurred early one morning, when Ratthana Sok stepped outside his

---

[15] Crumpton, 181 Wn.2d 252; State v. Thompson, 173 Wn.2d 865, 271 P.3d 204 (2012); In re Bradford, 140 Wn. App. 124, 165 P.3d 31 (2007).

[16] Crumpton, 181 Wn.2d at 261.

[17] Id.

[18] Thompson, 173 Wn.2d at 875.

[19] Crumpton, 181 Wn.2d at 263.

[20] 166 Wn.2d 358, 209 P.3d 467 (2009).

[21] Id. at 363.

house.[22] He noticed a car parked on the street with several passengers inside.[23] One male passenger exited the car and approached Sok.[24] He was wearing a white hat.[25] Sok recognized the man as Riofta whom he had known well for several years.[26]

Riofta asked for a cigarette, but Sok explained that he did not smoke.[27] Riofta pulled out a revolver and attempted to shoot Sok in the forehead.[28] Sok escaped and Riofta fled, dropping the white hat on the sidewalk.[29]

It was discovered afterwards that the car had been stolen the night before and that the white hat belonged to the car's owner.[30]

At trial, Sok identified Riofta.[31] The State also presented Riofta's motive to scare Sok's brother, to deter him from cooperating in the separate prosecution of

---

[22] Id. at 362.

[23] Id.

[24] Id.

[25] Id.

[26] Id. at 363.

[27] Id. at 362.

[28] Id.

[29] Id.

[30] Id. at 363.

[31] Id.

two of Riofta's acquaintances who had been charged in connection with a deadly massacre.[32]

Postconviction, Riofta moved for the white hat to be DNA tested.[33] He argued that such testing would prove someone else had worn the hat at the time of the shooting, and was thus the identified shooter.[34] The supreme court disagreed.[35]

Presuming that DNA testing would prove favorable to Riofta, the court reasoned that two outcomes were possible. The hat could show either the absence of Riofta's DNA or the presence of another person's DNA.[36] Neither outcome, the court held, would "likely demonstrate [Riofta's] innocence on a more probable than not basis."[37]

The absence of Riofta's DNA would not be probative because the shooter had only worn the hat briefly, "perhaps only as long as it took to walk over from the curb and fire the gun."[38] Additionally, Riofta's head was shaved and was less

---

[32] Id.

[33] Id.

[34] Id. at 361.

[35] Id. at 362.

[36] Id. at 370.

[37] Id.

[38] Id.

8

likely to leave DNA evidence.[39] Thus, "the absence of his DNA on the white cap would not exclude him as the perpetrator."[40]

The presence of a third person's DNA on the hat would also fail to exclude Riofta as the perpetrator.[41] "Any of a number of people besides the shooter could have worn the white hat at some time after the vehicle was stolen."[42] Absent some special fact tying Riofta alone to the hat, the presence of another's DNA would be unavailing.[43]

Based on these considerations and Sok's strong eyewitness identification, the supreme court concluded that Riofta had failed to show that a favorable DNA result would demonstrate his innocence on a more probable than not basis.[44]

The court also held that a letter Riofta had submitted from trial counsel for the defendants in the massacre prosecution was unpersuasive.[45] The letter stated that one of the defendants in that case had told his counsel that Riofta was innocent and that he knew the identity of the real shooter but would not

---

[39] Id.

[40] Id.

[41] Id.

[42] Id.

[43] Id. at 371.

[44] Id.

[45] Id. at 372.

disclose it.[46] The supreme court explained that "posttrial affidavits casting blame on third parties 'are to be treated with a fair degree of skepticism.'"[47]

Here, a favorable DNA test result would not show a reasonable probability of Senior's innocence. Such a result would show either the absence of Senior's DNA or the presence of another person's DNA on the watch fragments.

Taken alone, such a result would have no probative value because it would show, at best, that someone had dropped a watch at a crowded gas station. Such a result would provide even weaker evidence than the result proposed in Riofta where the evidence at least established that the shooter had worn the hat, and certainly weaker evidence than that supporting testing in the single rapist cases.

In the single rapist cases, the DNA test result necessarily had to show the rapist, and would show whether it was the defendant or a different person. In Riofta, several people, relevant or irrelevant to the criminal conduct, could have worn the hat. Here, anyone at the crowded gas station, whether at the time of the shooting, or prior, could have left the watch fragments.

Presuming a favorable DNA test result, the jury's guilty verdict is still supported by substantial other evidence. Amie Hudson, an eyewitness bystander at the gas station, testified that she had watched Senior as he fired the gun at Webster's head. Additionally, ballistics tests showed that the rifling

---

[46] Id.

[47] Id. (quoting Herrera v. Collins, 506 U.S. 390, 423, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (O'Connor, J., concurring)).

characteristics of a gun seized from Antoine's bedroom were consistent with a fired bullet found at the crime scene. Bullock identified Senior, Antoine, and Swaggerty in a photographic lineup. And he explained that Senior was the one he was not holding back when Webster was shot.

Senior points to inconsistent testimony given by other witnesses. For example, Levonte Smith testified at trial that Senior was not the shooter. Other witnesses variously described Senior's height. They variously described the color of his shirt. And they variously described his skin color. But the jury still found Senior guilty beyond a reasonable doubt, and it is unclear how a favorable DNA test result standing alone would be relevant or helpful. The trial court reached this conclusion, stating that Senior had not shown that "DNA testing of the identified items . . . would be material to the identity of the perpetrator."

A favorable DNA test result could be probative only if the trial court found Antoine's declaration credible. The trial court, properly exercising its discretion, concluded that "[t]here is no credible evidence that supports" Senior's contention that DNA testing would show his innocence. The trial court could reasonably treat Antoine's declaration, given his involvement with the crime and his inconsistent earlier statements to police, with skepticism.

The other supporting document Senior provided, the map, does not help his argument. It shows that the watch pieces were found approximately 12 feet from the fired bullet and 18 feet from the casing. Such a distance attenuates any connection between the shooter and the watch.

Even if the trial court found Antoine's declaration credible, it could still find that Senior failed to meet his burden. Daz has not been identified. Consequently, his DNA has not been tested. Thus, a favorable DNA test result would merely show that *somebody* aside from Senior left DNA on the watch.

For these reasons, the trial court did not abuse its discretion in denying Senior's motion to have the watch tested for DNA. Because he has made no argument on appeal regarding a test for fingerprints, we hold this argument abandoned.[48]

We affirm the order denying the motion for DNA testing.

_____
Cox, J.

WE CONCUR:

_____
Mann, A.J.

_____
Becker, J.

_____

[48] Holder v. City of Vancouver, 136 Wn. App. 104, 107, 147 P.3d 641 (2006).