IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33018-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT JAMES MIDDLEWORTH JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — After this court affirmed Robert Middleworth's convictions for

first degree child rape and first degree child molestation, he filed a motion in superior

court for postconviction testing of viral DNA[1] collected from his genital lesions during

the police investigation. The court denied his motion on several grounds. We affirm the

superior court on the basis that Mr. Middleworth fails to demonstrate that the DNA

testing he requests would provide significant new information or be likely to demonstrate

innocence on a more probable than not basis.

FACTS AND PROCEDURAL BACKGROUND

Beginning in August 2010, Robert Middleworth lived with a girlfriend and her

five-year-old daughter, B.D.[2] About September 17, 2010, B.D. began complaining that it

hurt to go to the bathroom. On September 21, B.D.'s mother took her to the doctor.

---

[1] Deoxyribonucleic acid.
[2] Initials are used to protect the identity of the child victim. *See* General Order of
Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses.*
(Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/.

When the pediatric nurse practitioner who initially examined B.D. observed infection and possible genital trauma and asked B.D. how her bottom got sore, B.D. answered that "Rob" had laid her down on the floor. Report of Proceedings (RP) at 758.[3] The nurse practitioner did not question B.D. further about Rob but did consult with her colleague, Dr. Joseph Wren, a child abuse specialist, and reported what she had seen and heard to Child Protective Services (CPS), which immediately commenced an investigation. Following Dr. Wren's examination of B.D., a further examination by Dr. Joel Edminster, and cultures and testing, B.D. was diagnosed with a herpes infection in her genital area, bacterial vaginosis, and a urinary tract infection. Tests were not conducted to determine what type of the herpes simplex virus (type 1 or type 2) B.D. had. Herpes 1 is typically an oral virus, whereas herpes 2 typically affects the genitals.

On September 29, after Mr. Middleworth was placed under arrest, he submitted to collection of a rape kit by a nurse, Alysa Reynolds, at the emergency room of St. Mary's Medical Center. In the course of collecting the rape kit, Ms. Reynolds physically examined Mr. Middleworth and observed two lesions on his penis. She took swabs of the two lesions that she included in the rape kit. Upon completing her examination and collection, she sealed the rape kit and turned it over with a chain of custody form to the

---

[3] All references to the report of proceedings are to the February 7, 2011 volume that includes hearings on pretrial motions and Mr. Middleworth's three trials.

College Place Police Department.

The rape kit was forwarded by the police department to the Washington State Patrol Crime Lab, but was never opened by laboratory personnel. During pretrial motions, the prosecutor represented to the court that no human DNA analysis was performed by the crime lab because there was no perpetrator DNA collected from B.D. or the scene of the alleged rape and molestation (such as bodily fluid or hair) to which the specimens in the rape kit could be compared. A College Place police officer testified at trial that the state crime lab does not test for pathogens or diseases.

Two weeks after collection of the rape kit from Mr. Middleworth, the State obtained a search warrant to take an additional blood draw from him, to be tested for herpes. The blood draw was also taken at St. Mary's, although it was sent to a medical laboratory, rather than the crime lab, for testing. The report received from the medical laboratory indicated that Mr. Middleworth had antibodies for both types of the herpes simplex virus, establishing that both were in his system.[4] As Dr. Wren explained at trial, "you never get rid of herpes, it stays with you for life." RP at 713.

The State charged Mr. Middleworth with first degree rape of a child and first

---

[4] The test also showed that Mr. Middleworth had low levels of immunoglobulin M—an antibody produced when someone is initially exposed to the virus or at the beginning of an outbreak. This indicated that he had not contracted herpes recently. It did not necessarily indicate that he had not had an active outbreak recently, because the antibody levels do not always increase with every recurrent outbreak.

3

degree child molestation. At trial, B.D. testified that Mr. Middleworth had put his finger in her "private spots" "a lot" and a videotaped interview of B.D. by a CPS investigator was played for the jury. RP at 583-84. Dr. Wren and Dr. Edminster testified to matters observed in their physical examinations of B.D. that were consistent with sexual assault. Finally, the State presented the evidence that B.D. was diagnosed with genital herpes, that Mr. Middleworth had tested positive for herpes, and that the most likely manner in which B.D. would have contracted genital herpes was genital to genital contact. Both physicians testified that genital herpes is not something that they would expect to see in a five year old. As Dr. Wren explained, "[G]enital herpes is not something that is passed casually by toilet seats or—it is passed by sexual contact and we would not expect a five year old to be sexually active." RP at 706. A jury found Mr. Middleworth guilty as charged. He appealed.

This court substantially affirmed Mr. Middleworth's judgment in an opinion filed on February 6, 2014, reversing only an order awarding restitution for the State's expert witness fees. *See State v. Middleworth*, No. 30850-2-III (Wash. Ct. App. Feb. 6, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/308502.unp.pdf, *review denied*, 180 Wn.2d 1025, 328 P.3d 902 (2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 464, 190 L. Ed. 2d 348 (2014).

Within a couple of weeks of the filing of this court's opinion, Mr. Middleworth moved in superior court, pro se, for postconviction DNA testing under RCW 10.73.170.

4

Specifically, he sought "PCR testing" of the swabs taken of his penile lesions, arguing that it could show that he could not have transmitted herpes to B.D. Resp't's Br., App'x D. Polymerase chain reaction, or "PCR," involves copying a short segment of DNA millions of times, a process known as amplification. It is particularly useful for testing degraded DNA samples or samples with low levels of DNA. *State v. Bander*, 150 Wn. App. 690, 700, 208 P.3d 1242 (2009).

Mr. Middleworth's pro se motion argued that (1) the rape kit was collected from him for the purpose of testing by the state crime lab, (2) the prosecutor misrepresented to the trial court that the reason the state crime lab did not test the viral DNA collected from his lesions was because it lacked the ability to perform PCR analysis to identify the herpes virus, (3) B.D.'s mother or father could have transmitted herpes to her, and (4) the failure to perform PCR analysis on the swabs deprived him of exculpatory evidence. Resp't's Br., App'x D. The State opposed the motion on the basis that the purpose for which Mr. Middleworth was requesting DNA testing was not clear. It also provided correspondence from the Washington State Patrol Crime Lab manager confirming that the state lab does not conduct virus or bacteria analysis.

The superior court denied Mr. Middleworth's motion for DNA testing on several bases. Substantively, it ruled that "[t]here is no reasonable means available to test the DNA of the herpes virus," and "it is unlikely that, even if the virus were able to be tested

5

for DNA evidence, any evidence of an exculpatory nature would be discovered."

Resp't's Br., App'x F. Mr. Middleworth appeals.

## ANALYSIS

"[A]s a response to developing technology, postconviction DNA testing has been widely accepted as a way to ensure an innocent person is not in jail," even though "[t]here is no constitutional right to DNA testing." *State v. Crumpton*, 181 Wn.2d 252, 258, 332 P.3d 448 (2014). "RCW 10.73.170 provides a mechanism under Washington law for individuals to seek DNA testing in order to establish their innocence." *Id.*

Under RCW 10.73.170(1),

> A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.

The motion must state that "[t]he DNA testing now requested would . . . provide significant new information" and explain "why DNA evidence is material to the identity of the perpetrator of . . . the crime." RCW 10.73.170(2)(a)(iii), (b). The motion shall be granted if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). When deciding whether it is likely the DNA evidence would demonstrate innocence, the trial court considers all the evidence from trial and assumes the DNA test would return an exculpatory result. *Crumpton*, 181 Wn.2d at 260.

6

We review a trial court's decision on a motion for postconviction DNA testing for abuse of discretion. *State v. Thompson*, 173 Wn.2d 865, 870, 271 P.3d 204 (2012). We may affirm a lower court's ruling on any grounds adequately supported in the record. *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004).

Mr. Middleworth is represented by counsel at this stage of the proceedings, and on appeal his briefing explains three respects in which he contends PCR analysis of the viral DNA collected from his genital lesions would provide significant new information demonstrating probable innocence. He now argues it would show (1) whether the lesions were the result of the herpes virus at all, (2) assuming the lesions were herpetic, whether they were the result of herpes 1 or 2, and (3) whether the particular strain of herpes in his system matched the strain in B.D.'s system. Even if we give Mr. Middleworth the benefit of this improved articulation of his argument, and assume without agreeing, that RCW 10.73.170 applies to the testing of viral DNA,[5] Mr. Middleworth has not made the showing required by the statute.

---

[5] The State argues that RCW 10.73.170 should be construed to authorize only orders for the testing of human DNA, not viral DNA, and points out in this connection that under RCW 10.73.170(5), "DNA testing ordered under this section shall be performed by the Washington state patrol crime laboratory." RCW 10.73.170(5). According to testimony at trial and the State's opposition to Mr. Middleworth's motion in superior court, the state patrol crime lab does not conduct viral DNA analysis. We defer these arguments to another day, since this appeal can be resolved on the basis of Mr. Middleworth's failure to make the showing required to obtain any court-ordered DNA testing.

*1. Showing that the Lesions were Not Herpetic Does Not Provide Significant New Information*

Nurse Reynolds testified that Mr. Middleworth's penile lesions "had the appearance of sores that very likely could have come from a sexually transmitted disease" but acknowledged that she could not say, from their appearance, that they were herpetic. RP at 793. Mr. Middleworth argues that if PCR analysis of the viral DNA she collected showed that the lesions were not herpetic, he could not have transmitted the virus to B.D.

His argument is premised on a misunderstanding that herpes can only be transmitted when an individual is experiencing lesions. He cites to one excerpt of Dr. Wren's testimony that appears in isolation to support his argument,[6] but other testimony establishes that herpes can be transmitted even when the host is asymptomatic:

Q  Is it possible to transmit the herpes virus while being asymptomatic?
A  Yes.

RP at 208 (examination of Dr. Joel Edminster at Mr. Middleworth's first trial). Mr. Middleworth has failed to show that an individual can only transmit herpes when he or

---

[6]  Q Okay. Now, you were talking about how herpes gets spread and if it is the herpes virus, whether it is on the mouth or on the genitals, it would have to be transferred from the person who has an active lesion—
A  Uh-huh.
Q  —and put into the person who is a recipient; correct?
A  Correct.

RP at 725 (testimony of Dr. Joseph Wren on cross-examination).

she has lesions. Evidence that Mr. Middleworth's lesions were due to something other than herpes would not establish that he had not transmitted the virus to B.D.[7]

*2. Whether the Lesion was an Outbreak of Herpes 1 or 2 is Insignificant*

PCR analysis of the viral DNA could determine whether Mr. Middleworth's lesions, if herpetic, were herpes 1 or 2. But he fails to explain how this information would be helpful. B.D. was tested for herpes, but her test did not determine whether she had herpes 1 or herpes 2. B.D.'s herpes was genital—the most common place for herpes

---

[7] Research of reliable sources outside the record indicates that herpes is only transmittable when active, but that it can be active without symptoms appearing. Gregory J. Mertz, *Asymptomatic Shedding of Herpes Simplex Virus 1 and 2: Implications for Prevention of Transmission*, 198 J. INFECTION DISEASES STUD. 1098 (2008) [https://perma.cc/2MRT-EGJ8]. In fact, herpes is more commonly transmitted during a process called asymptomatic viral shedding than during a period where an individual has visible herpes lesions. *Id.* Consequently, Mr. Middleworth is incorrect when he claims that if his lesions were not herpetic he could not have transmitted herpes to B.D. He is, however, correct that herpes cannot be transmitted if the virus is not active—when there are no symptoms *and* when asymptomatic viral shedding is not occurring. *Herpes Signs and Symptoms*, AM. SEXUAL HEALTH ASS'N, http://www.ashasexualhealth.org/stdsstis /herpes/signs-symptoms/ (last visited Feb. 13, 2016).

Mr. Middleworth has not provided any evidence that publicly available PCR analysis can determine whether herpes is inactive. And if there is, it could only establish that he was not contagious on the date the swabs were taken—September 29, 2010. B.D. testified that it had been more than one day since Mr. Middleworth had touched her when her mother took her to the hospital, which was on September 21, 2010. Assuming Mr. Middleworth touched B.D. as late as September 20 (a generous date, considering the fact that B.D. was already exhibiting symptoms by then), nine days would have passed between the touching and the swabs being taken. Unless Mr. Middleworth can show that the status of his herpes on September 29 would be identical to the status of his herpes during the time period he was accused of molesting or raping B.D., the status of the virus on September 29 is insignificant. Testimony at trial reflects that a herpes "flare-up" can resolve itself within several days to a little over a week. RP at 817.

2 to present—but the two strains of herpes have become intermixed due to sexual practices, so the location of her herpes is not determinative. Without knowing whether B.D. had herpes 1 or 2, a test that shows Mr. Middleworth potentially only had one active strain would not eliminate him as a source of transmission.

3. *Testing Would Not Demonstrate Innocence Where Mr. Middleworth Has Not Shown it is Available*

Finally, Mr. Middleworth suggests that PCR analysis of viral DNA can reveal genetic differences in strains of the herpes virus such that it would be possible to determine whether his strain of herpes matched the strain in B.D. In support of his claim he cites to Hisatoshi Kaneko et al., *Discrimination of Herpes Simplex Virus Type 2 Strains by Nucleotide Sequence Variations*, 46 J. CLINICAL MICROBIOLOGY 780 (2008).[8] In that article, researchers from Fukushima and Kawasaki, Japan, analyzed the DNA of herpes viruses taken from 36 Japanese individuals and found areas with enough genetic diversity to distinguish between strains, and potentially determine whether a strain originated from the same outbreak. The article recommended a database to compare and contrast samples of the viruses on an international level. However, while the technology that can analyze herpes DNA in this way evidently exists and was available to the microbiologists and medical researchers in Japan who performed the study, Mr. Middleworth has failed to show that this technology is publicly available, that it is

---

[8] http://jcm.asm.org/content/46/2/780.full.pdf+html.

10

generally accepted in the medical community, or that someone is available to perform the analysis on viral DNA from Mr. Middleton's and B.D.'s herpes.[9] From the article, the technology appears only to have been in developmental stages.

The dissent suggests that we ignore the holding of *Crumpton* if we fail to presume that research microbiologists are available somewhere, at some price, to sequence and compare the viral DNA of Mr. Middleworth's and B.D.'s herpes to see if they match. But in *Crumpton*, the Supreme Court was reviewing the denial of a motion that sought conventional human DNA testing from the state crime lab. Nothing in *Crumpton* suggests that a trial court presented with a motion for DNA testing under RCW 10.73.170 is required to presume that somewhere in the world there are researchers in advanced laboratories capable of applying cutting edge technology that could potentially be exculpatory. In this connection, it is informative to look to the federal Innocence Protection Act, 18 U.S.C. § 3600, which was the "driving force" behind amendments to RCW 10.73.170 in 2005. *Crumpton*, 181 Wn.2d at 266 (Stephens, J., dissenting). It provides that to obtain a court order for postconviction testing, the proposed testing must be "reasonable in scope, use[ ] scientifically sound methods, and [be] consistent with accepted forensic practices." 18 U.S.C. § 3600(a)(5).

---

[9] The parties have not briefed whether, and on what basis, B.D. could be required to provide a sample of the viral DNA from her herpes.

Without further information that the testing he seeks is even available to be ordered, Mr. Middleworth has not shown that an order would produce significant new information or more probably than not demonstrate his innocence. Accordingly, the trial court did not abuse its discretion when it denied Mr. Middleworth's motion for postconviction DNA testing.

*Costs on Appeal*

Mr. Middleworth asks this court to deny the State appellate costs if he is unsuccessful on appeal. Having reviewed his report and argument, the panel exercises its authority under RAP 14.2 and denies costs to the State.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

I CONCUR:

Korsmo, J.

12

No. 33018-4-III

LAWRENCE-BERREY, A.C.J. (dissenting) — Following two mistrials, a third jury convicted Robert Middleworth of first degree child rape and first degree child molestation.

Conflicting statements by B.D. implicated both Mr. Middleworth and B.D.'s step-grandfather as the source of her trauma. B.D.'s statements implicating her step-grandfather were unknown to defense counsel until the third trial was well underway.

The only physical evidence linking B.D.'s trauma with Mr. Middleworth was that they both had herpes simplex 1 and simplex 2. Perhaps because of the late disclosure of B.D.'s statements implicating her step-grandfather, defense counsel did not consider obtaining an order requiring the step-grandfather to submit to herpes testing.

In closing arguments, the State emphasized the herpes link between B.D. and Mr. Middleworth. This link was a significant factor in Mr. Middleworth's convictions.

The record establishes that 80 percent of the general population has herpes simplex 1 and a somewhat lower percentage has herpes simplex 2. For this reason, the herpes "link" implicates a substantial portion of the general population.

When deciding whether it is likely the deoxyribonucleic acid (DNA) evidence would demonstrate innocence, the trial court considers all the evidence from trial and assumes the DNA test would return an exculpatory result. *State v. Crumpton*, 181 Wn.2d 252, 260, 332 P.3d 448 (2014). The trial court was therefore required to assume that viral DNA tests would show that Mr. Middleworth's and B.D.'s viral DNA strains are different. If their viral DNA strains are different, this would exclude Mr. Middleworth as the source of B.D.'s herpes. This would mean that B.D. had sexual contact with a person other than Mr. Middleworth. It is highly unlikely that B.D., a five-year-old girl, had sexual contact with more than one person. Mr. Middleworth has therefore demonstrated that the requested DNA tests would provide significant new evidence to demonstrate his innocence on a more probable than not basis. This meets the statutory standards. RCW 10.73.170(2)(a)(iii), (2)(b), (3). The trial court, therefore, abused its discretion when it determined that the legal standards were not met.

The majority does not inquire whether the statutory standards have been met, but instead focuses on evidentiary issues extraneous to the statutory language. The majority notes that Mr. Middleworth has failed to show that viral DNA testing is publicly available, that viral DNA testing is generally accepted in the scientific community, and that someone is available to perform the requested viral DNA analysis. But these evidentiary inquiries are not part of our analysis at this stage. Rather, at this stage, we inquire only if the statutory standards have been met. *See Crumpton*, 181 Wn.2d at 263

2

(Meeting the statutory standard "affects only whether the DNA will be tested . . . . [It] is simply the first step on the journey for a new trial.").

The majority argues that evidentiary issues are properly considered prior to ordering DNA testing. In its argument, the majority cites a similar federal statute, 18 U.S.C. § 3600(a)(5). That statute directs trial courts to consider various evidentiary issues, such as those considered by the majority, before ordering postconviction testing. But RCW 10.73.170 omits this language that appears in § 3600(a)(5). When a state statute that is largely patterned after a federal statute omits language contained in the federal statute, it is a clear indication that the state legislature intended not to adopt the omitted portion of the federal statute. *Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 427-28, 833 P.2d 375 (1992). For this reason, the majority's cite to 18 U.S.C. § 3600(a)(5) supports the narrow statutory inquiry made in *Crumpton*.[1]

The closer question (which the majority avoids) is whether RCW 10.73.170 should be construed as limited to *human* DNA testing. I would answer this question in the negative because there is nothing in the statute that limits its application to human DNA testing. The purpose of RCW 10.73.170 is to allow advances in DNA technology

---

[1] If viral DNA testing is not available, Mr. Middleworth will not receive a new trial. If viral DNA testing is available and performed, and the results do not warrant a motion for a new trial, Mr. Middleworth will not receive a new trial.

If, however, the results warrant requesting a new trial, the State can move to exclude the DNA test results. The trial court would then preside over a formal hearing so an adequate record for appeal can be made. The majority's holding, which requires an applicant to establish the admissibility of DNA test results *prior to* the results, puts the cart before the horse.

3

to set innocent people free. *Crumpton*, 181 Wn.2d at 258. Construing RCW 10.73.170 broadly so as not to limit it to human DNA testing best fulfills this purpose.

Because the record establishes that favorable viral DNA tests would provide significant new information that would demonstrate Mr. Middleworth's probable innocence, I dissent.

Lawrence-Berrey, A.C.J.