# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  60390-0-II |
| Respondent, | |
| v. | |
| ROBERT RUFUS WILLIAMS, | PUBLISHED OPINION |
| Appellant. | |

LEE, J.—Robert R. Williams was convicted of assaulting Charlotte Budlong.  Years after his conviction, Williams moved for postconviction DNA testing of several items of evidence from the investigation, none of which had been previously tested for DNA.  The evidence included sexual assault kit swabs from Budlong taken soon after the attack; swabs of Budlong's hands, fingernails, and clothing taken soon after the attack; and evidence from Budlong's truck.  The trial court denied Williams' motion.

By statute, courts must allow postconviction DNA testing if, presuming the DNA test results would be favorable to the convicted person, those results would demonstrate the convicted person's innocence on a more probable than not basis.  Williams contends that the trial court failed to show it applied the required favorable presumption that the DNA test results would demonstrate the absence of Williams' DNA and the presence of another person's DNA on all the requested items of evidence.  Williams further argues that the trial court abused its discretion by concluding that these favorable DNA test results would not show his innocence on a more probable than not basis.

We conclude that the trial court abused its discretion by failing to articulate that it was applying the required presumption of favorable DNA test results and failing to analyze the impact of those presumed results given the evidence presented at trial. We reverse and remand for the trial court to conduct the proper legal analysis in determining Williams' motion for postconviction DNA testing.

FACTS

A. BACKGROUND & TRIAL

1. Budlong's Assault

Williams and Budlong were in an off-and-on dating relationship for about a decade, and they remained amicable after they broke up. Budlong then became engaged to another man.

At some time after midnight on the night of May 30, 2007, Budlong, who was in her sixties, was assaulted and severely injured in her home after arriving home from work.

The next afternoon, Budlong's daughter went to Budlong's house after several failed attempts to contact Budlong. When Budlong's daughter arrived at the house, the front door was open and Budlong's truck was gone. Budlong's daughter found Budlong on the couch, unconscious and covered in blood. Budlong was "half dressed," wearing only unfastened pants and a bra with a bathrobe draped around her. 6 Verbatim Rep. of Proc. (VRP) at 419.

a. Budlong's statements about the assault

When Budlong woke up, she was confused and could not respond to questions. She said that she did not know what happened to her. Paramedics took Budlong to the hospital, where she stayed for more than a month. As a result of the assault, Budlong had a fractured skull, two broken forearms, a broken pinky finger, and an injured spleen.

While in the hospital on the day after the assault, Budlong was able to answer simple questions. When asked if Williams had attacked her, Budlong said, "No." 13 VRP at 1431. Several days after the assault, Budlong was again awake and able to answer some questions. Budlong stated that she did not know who the attacker was. When asked specific questions about the attacker, Budlong said her attacker was a white male in his fifties acting alone. This was consistent with her prior answer that Williams was not her attacker because Williams is Black. The next day, Budlong could not remember anything about her attacker. As Budlong continued to recover, she could not remember the attack "at all." 7 VRP at 614.

At trial, Budlong testified that she only remembered coming home from work on the night of the assault, bringing items from her truck to her porch, opening her front door, and letting her daughter's dog out. Budlong could not remember anything else about arriving home or the attack.

> b.    Evidence gathered

Soon after Budlong arrived at the hospital, police obtained most of the clothing Budlong was wearing when she was assaulted, including Budlong's engagement ring with the diamond displaced. Police also collected fingernail clippings and hand swabs from Budlong because "sometimes if you're fighting with someone and you're struggling, you might scratch the person, you might touch the person that's assaulting you and that person's skin cells could be left on your hands or underneath your fingernails." 9 VRP at 797-98. Police also received the vaginal and anal swabs from Budlong's sexual assault exam. Police were concerned about a possible sexual assault because of Budlong's state of dress when her daughter found her and blood found in the upstairs bedrooms of her home.

3

Police searched Budlong's home for evidence. They observed blood in several locations in Budlong's dining room, as well as loose coins, a debit card, a pair of glasses with a broken lens, and a broken women's watch. One detective testified at trial that these items were "clearly indications of violence, of a struggle." 7 VRP at 560. Police also found blood in the kitchen, including a bloody paper towel, bloodstains on a blanket and towel in an upstairs bedroom, blood in an upstairs bathroom, a bloody shirt and other clothing items in the main upstairs bedroom, and bloody footprints.

2.    Williams and Budlong's Relationship

Williams and Budlong ended their long-term relationship approximately a year before Budlong's assault. At the time of the assault, Williams was also in his sixties.

After she and Williams broke up, Budlong tried to stay "amicable" with Williams and sometimes let him stay in her house. 9 VRP at 861. About two or three weeks before the assault, Budlong told Williams that she was dating a new man. According to Budlong, Williams "sounded surprised" but did not react in a "friendly or unfriendly" manner. 9 VRP at 870. Also, Williams had never been "intimidating or threatening" to Budlong, and Budlong had never seen Williams in "a jealous rage." 9 VRP at 902.

Williams' and Budlong's friend testified at trial that, in the last week of May, he informed Williams that Budlong was engaged to her new boyfriend and Williams "got pretty upset. . . . [H]e was calm, but I could tell he was a little upset." 10 VRP at 1072.

Budlong's daughter testified that several days after the assault, she updated Williams on Budlong's condition and Williams said "he really screwed up and he doesn't know how he's going to fix it." 6 VRP at 454.

4

3.    Budlong's Truck

At about 1:15 a.m. on the night of Budlong's assault, police received a report that a truck had crashed into a fence about a half a mile away from Budlong's home. Police later realized that the truck belonged to Budlong.[1] Police arrived at the scene of the crash at about 1:30 a.m. and observed that there were no weapons in the truck and there was nobody in the surrounding area. Several of the truck's windows had been smashed.

At trial, the owner of the fence testified that he woke up to a loud noise and saw that an idling truck had crashed through his fence. He did not see anybody in or near the truck. When he went out to look at the truck, he saw a metal pipe leaning against the passenger seat.

A different neighborhood witness testified that he heard a crash at some time after midnight. He also saw a vehicle crashed into the fence and a Black man walking down the street.

Jose Hernandez-Morenos, who also lived close to the location of the crash, testified that he woke up to the sound of a loud crash on the night of Budlong's assault. From his window, Hernandez-Morenos saw a truck crashed into the fence, went to investigate, and did not see anybody except another neighbor. Hernandez-Morenos also saw something like a "pipe" or a white "spray can" in the passenger seat of the truck, and about 10 or 15 minutes later, he saw a car park next to Budlong's truck. 8 VRP at 720. A person got out of the car and retrieved something from inside the truck before leaving.

Hernandez-Morenos spoke to the police the day after the crash. He told the police that the person he saw was a Black man between 35 to 40 years old in "worn out clothes." 8 VRP at 726.

---

[1] The officer who went to the scene of the crash attempted to notify Budlong of the crash that night but went to the wrong address. As a result, Budlong was not found until the following day.

At trial, Hernandez-Morenos testified that he did not recognize Williams when police showed him a photo, but he also said, "[T]o me all of them kind of look alike." 8 VRP at 726. Hernandez-Morenos also could not identify Williams in the courtroom based solely on his recollection of what he saw after the crash.

Hernandez-Morenos initially told the police that he saw a white Nissan Sentra. However, he later told police that it was a white Nissan Infiniti. At trial, Hernandez-Morenos testified that the car was a white Nissan Infiniti.

Police collected evidence from Budlong's truck, including fingerprints that matched Budlong, her daughter, and her nephew, who was in juvenile detention at the time of the assault. Police did not find any blood in Budlong's truck.

At trial, one of Williams' friends testified that Williams said he kept a steel bar in his car for protection, but the friend never saw the steel bar. Williams' girlfriend testified that she rode in Williams' Infiniti several times but did not see anything like a steel bar.

4.      Investigation of Williams

        a.      Initial investigation

On June 1, 2007—two days after Budlong's assault—police spoke with Williams at his home. At the time, Williams was staying at a campground community where he owned two lots and several trailers.

One detective described Williams as "more than willing to help" with the investigation. 8 VRP at 675. Williams first said that he had last seen Budlong several months ago. But when asked again, Williams said he saw Budlong at about 11:00 a.m. the day before her assault.

Williams then told the police that on the day before Budlong's assault, he went to a doctor's appointment in Tacoma at 3:00 p.m. Williams said he had a back injury and was taking morphine. Detectives observed that Williams' movements were "[s]omewhat slow and deliberate," and he sometimes used a cane. 10 VRP at 957. On the way to his appointment, Williams met with Budlong and retrieved some keys from her. After the appointment, Williams went to a club and left at about 8:00 p.m. Williams said that after leaving the club, he met a sex worker named Joyce and had sexual intercourse with her in his car. Because it was dark out and Williams could not drive at night, he slept in his car in a parking lot before driving home in the morning.

Williams told the police that he got back to the campground around noon. He entered the gate to the campground by following behind another vehicle. Williams also said that he had a friend staying with him at the campground.

Williams told the detectives that he drove a Ford Bronco to meet Budlong on the day before her assault, but the detectives observed that the Ford Bronco on Williams' property "appeared not to have been driven" because it was covered in pine needles and cobwebs. 8 VRP at 684. Williams also had a white Nissan Infiniti at the property.

After talking with the detectives, Williams agreed to be interviewed at the police station that day and agreed to let detectives search his home and vehicles. During their search, detectives did not find any blunt objects that could have been used to assault Budlong. The detectives testified that they were looking for blood in Williams' cars but did not find any. The police also did not mention or report that Williams had any injuries at the time.

Police ran a computer search for people with Joyce's basic physical description but did not find any matches and did not make further attempts to find her. As part of the investigation, Police

7

recovered a video from the evening of Budlong's assault that confirmed Williams was driving his Infiniti instead of his Bronco, which led to his arrest.

### b.    Arrest and further investigation

#### i.    Williams' injuries and demeanor

Police arrested Williams on June 8, 2007, more than a week after Budlong's assault.  After arresting and interviewing Williams, police noticed that Williams had a cut on his forehead, cuts on his fingers, and "faint scratch marks" on his cheek.  13 VRP at 1413.  Williams told police that he received the injuries on May 30, while fixing a tarp on his property when he slipped on a pile of firewood and hit his head.

The detectives who spoke with Williams on June 1 did not see any scratches or blood on Williams' hands or face.  The detective who interviewed Williams at the police station on June 1 also did not notice any injuries.  At trial, that detective testified that he and Williams "were five feet apart for the better part of an hour.  If there was something there, unless it was very, very minor, I'm comfortable that I would notice that."  13 VRP at 1490.

After arresting Williams, police interviewed him again.  During this interview, when police told Williams a hypothetical story in which he assaulted Budlong, Williams nodded his head but denied his involvement.  Also, when Williams was told that Budlong's daughter deserved to know the truth about what happened to her mom, Williams got emotional—"his eyes were welling up and he was sitting there clenching his jaw"—but he continued to deny any involvement in Budlong's assault.  13 VRP at 1408.

ii.    Search of Williams' Infiniti

Police searched Williams' Infiniti again after his arrest, and police found blood on the exterior and interior of the car, including on a towel underneath the driver's seat. A DNA test of one sample showed that the blood was from Williams. However, the police chose not to test some of the blood evidence from Williams' Infiniti. At trial, a forensic technician explained that she did not test some of these bloodstains presumably because there were no bloodstains in Budlong's truck:

> [I]f someone had left a bloody crime scene and then gotten into that vehicle and then into another vehicle, if I find blood in the second vehicle I should certainly find it in the first vehicle as well because it would make no sense why you would not transfer it in the first one but suddenly you're transferring it into the second one.

VRP (Jan. 9, 2009) at 66.

While the vehicles were being processed, police kept Budlong's truck and Williams' Infiniti in the same forensics area about 15 feet apart without any separating wall. Police testified that Budlong's truck could not be completely secured at this location because the windows were broken.

The forensic technician who searched Williams' Infiniti testified that she took more than 100 photographs during the search, stating that her team "pretty much photograph[s] our entire process all the way along," including items taken out of the car. VRP (Jan. 9, 2009) at 18. The forensic technician further testified that she gave all the items taken from the center console of Williams' Infiniti to a detective in the garage to sort through. The detective found a gas station receipt with a small bloodstain on it. The receipt showed a purchase at 11:57 p.m. on the night of Budlong's assault from a gas station blocks from Budlong's home. When reviewing video from

the gas station at that time, police discovered that Budlong had stopped at the gas station and received the receipt. Police testified that it looked like Budlong may have put the gas station receipt in her jacket pocket.

A photograph of the contents of the center console before the forensic team gave them to the detective does not show the gas station receipt. At trial, the detective testified that throughout the forensic search process, law enforcement was "not documenting every last little thing." 13 VRP at 1482. The detective also testified that the gas station receipt came from the center console of Williams' Infiniti.

Williams' defense counsel moved to exclude the gas station receipt because the chain of custody only started when the receipt was outside of Williams' car. The trial court denied the motion, relying on the detective's testimony.

DNA analysis of the blood on the gas station receipt tested positive for Williams' DNA. The detective who found the gas station receipt testified that because the bloodstain on the receipt was so thin, it was "probably some type of smear or secondary contact." 13 VRP at 1493. The forensic technician testified that the bloodstain was "thin" and that it may or may not have been possible that the blood was diluted with water before it was transferred to the receipt. VRP (Jan. 9, 2009) at 59.

At trial, Williams' defense counsel again raised the gas station receipt in the context of a motion for directed verdict:

> [T]here is a serious problem with the receipt evidence that supposedly ties Mr. Williams to Charlotte Budlong on the evening that she was attacked. The forensic expert testified that the blood was not thick, it appeared to have been thinned, and may have been thinned with water, with alcohol or distilled water, that sort of thing.

> And that evidence also was not found in his vehicle. [The detective] claims that it was found in material that was provided to him by [the forensic technician]. But the photographs of that material showing receipts, do not show that receipt.

14 VRP at 1565-66. The trial court concluded that if the jury believed the forensic technician's and detective's testimony, "one would naturally then infer that the receipt came from Mr. Williams' vehicle." 14 VRP at 1568. And the lack of photographic evidence of the gas station receipt did not mean that the receipt should have been excluded as evidence. The trial court denied the motion.

### iii.    Other evidence

After Williams' arrest, police collected Williams' ring because they thought it matched an injury on Budlong's shoulder. During cross-examination, a detective stated that the imprint on Budlong that would have come from the diamonds on the ring was larger than the diamonds themselves. The police did not find any of Budlong's DNA on Williams' ring. The police also tested Williams' shoes and did not find Budlong's DNA.

The private campground where Williams was staying is accessible through a security gate. Each resident of the campground has multiple cards to access the front gate that they can loan out to friends or family. At the time, Williams had a guest staying at the campground. On the night of Budlong's assault, one of Williams' keycards was used to open the gate at 2:34 a.m. This was a little over an hour after witnesses saw somebody retrieve an item from Budlong's crashed truck. Police testified that the route Williams said he usually took from Tacoma to the campground takes about an hour and 25 minutes when following the speed limit, but there is an alternate route that takes 45 to 50 minutes.

c. Verdict, sentencing, and direct appeal

The State charged Williams with first degree burglary, first degree robbery, attempted first degree murder, and first degree assault. A jury convicted Williams as charged except for attempted first degree murder, where the jury found for the lesser included crime of attempted second degree murder. The jury also returned four deadly weapon special verdicts. The trial court sentenced Williams to a total of 270.75 months with up to 120 months of community custody.

Williams appealed his convictions, and the facts recited in the direct appeal are consistent with the facts stated above. *State v. Williams*, noted at 160 Wn. App. 1036, slip op. at 1-3 (2011). In his direct appeal, Williams challenged the sufficiency of the evidence that he was the perpetrator. *Id.* at 5. This court concluded that there was sufficient evidence to support the verdict under the deferential standard for reviewing sufficiency of the evidence and affirmed Williams' convictions, except for the first degree assault conviction.[2] *Id*. at 5, 6.

B.    MOTION FOR POSTCONVICTION DNA TESTING

In 2024, Williams moved for postconviction DNA testing of evidence collected during the investigation of Budlong's assault. RCW 10.73.170 allows a person convicted of a crime to seek DNA testing in order to establish their innocence.

When moving for postconviction DNA testing, the convicted person must meet several procedural requirements that are not disputed in this case. RCW 10.73.170(2). The convicted person must then substantively show "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

---

[2] This court vacated Williams' first degree assault conviction based on double jeopardy.

In his motion, Williams requested DNA testing of several pieces of evidence:

- Swabs from Budlong's hands and clippings of her fingernails taken shortly after the assault.
- Vaginal and anal swabs from Budlong taken shortly after the assault.
- Clothing Budlong wore the night of the assault.
- Damaged glasses and a damaged watch from the scene of the assault.
- The key to Budlong's truck.
- The left front seat cover from Budlong's truck.
- Swabs from the driver's side door handle and horn area of Budlong's truck.

Regarding the substantive requirement of RCW 10.73.170, Williams argued that assuming his DNA was absent from these items of evidence and another individual's DNA was present on all of them, this result would raise a reasonable probability of his innocence.

At the hearing on Williams' postconviction DNA testing motion, the trial court started by saying, "I've reviewed all of the briefing materials, all of the transcripts, I've reviewed the cases, then went back again to review the briefing." VRP (May 10, 2024) at 4.

Williams' counsel argued that if the testing showed a different person's DNA "under the victim's fingernails and a sexual assault kit, on her clothing, on items related to the struggle and on swabs from the truck that we know the perpetrator drove, then that would necessarily call into question the receipt and all of the other State's evidence that was presented at the trial." VRP (May 10, 2024) at 10.

The State responded that even if the requested items of evidence showed DNA results from a different person, this result would still not demonstrate Williams' innocence because "the evidence still all points to him." VRP (May 10, 2024) at 11. The State further explained that Williams may have had an accomplice, though this theory was not argued at trial. And the State argued that, even assuming favorable DNA results for Williams, "there is no plausible

13

explanation" for Budlong's receipt from the night of the assault that police testified was found in Williams' car. VRP (May 10, 2024) at 12. The State also argued that the swabs from Budlong's sexual assault kit were not relevant because the State did not charge Williams with sexual assault.

Regarding Budlong's sexual assault kit swabs, the trial court asked several questions about their relevance. On this topic, the trial court concluded by asking:

> [I]f you test it and there is DNA, if she doesn't remember and there's no other evidence of a sexual assault, then the fact that there may be—it may demonstrate that she had sex, how does that support that there was a sexual assault or that that person whom she may have had sex with—because we're supposing a lot of things—was the perpetrator. If there's no allegation about a sexual assault, how is it that you think that there's relevant evidence that would come from a sexual assault or a DNA of the sexual assault exam?

VRP (May 10, 2024) at 16. Williams' counsel responded that such results, in addition to the presence of another individual's DNA on the other pieces of evidence, would provide more support for the identity of the perpetrator and could lead to further investigation revealing a sexual assault, which could be the basis for a new trial.

Ultimately, the trial court determined that Williams had largely met the procedural requirements of RCW 10.73.170. Regarding the substantive portion of the statute, the trial court reiterated that it had read the parties' briefing, the trial transcripts, the statute, and the case law, and stated that it understood that its decision "could have significant impact on an individual's life," including both Williams and Budlong. VRP (May 10, 2024) at 21. The trial court concluded:

> Based off of my review of all those materials and also having heard and considered the arguments that have been provided to the Court today, I do not believe that the defendant has shown that there's a likelihood the DNA evidence would demonstrate innocence on that more probable than not basis. I don't believe he's met his burden in considering all the other evidence that was presented to this Court by way of those trial transcripts.

> And again, you know, part of your argument about the circumstantial evidence, that is certainly a big thing for me to indicate that this was just a circumstantial case; it wasn't. There was direct evidence and while the State didn't go through and test every single thing, I don't know that anybody provided any authority to suggest that the State needed to have done that; or that the evidence— the potential exculpatory evidence based off of this DNA testing of the items that weren't actually tested, would on a more likely than not or more probable basis demonstrate that there is innocence in this case.

VRP (May 10, 2024) at 21. Accordingly, the trial court denied Williams' motion for postconviction DNA testing. The trial court issued a written order, but it did not make any written findings; instead, the court expressly incorporated its oral rulings and findings into its written order.

## ANALYSIS

A.    REQUIREMENTS TO OBTAIN POSTCONVICTION DNA TESTING

We review a trial court's denial of a motion for postconviction DNA testing for an abuse of discretion. *State v. Crumpton*, 181 Wn.2d 252, 257, 332 P.3d 448 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *State v. Thompson*, 173 Wn.2d 865, 870, 271 P.3d 204 (2012). Applying the wrong legal standard is an abuse of discretion. *Id.*

RCW 10.73.170 allows a person convicted of a crime to seek DNA testing to establish their innocence. The statute has several procedural requirements, including an assessment of whether DNA test results would be "material to the identity of the perpetrator . . . or accomplice," which neither party contests were met here. RCW 10.73.170(2)(b). The statute also requires that the convicted person substantively show "the likelihood that the DNA evidence would demonstrate

15

innocence on a more probable than not basis." RCW 10.73.170(3). On appeal, the parties dispute only whether the substantive component was met.[3]

When assessing the substantive requirement in RCW 10.73.170(3), courts must presume that the results of the DNA testing would be favorable to the convicted person. *Crumpton*, 181 Wn.2d at 260. "A court should look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis." *Id.* To assess this, courts must determine whether favorable DNA results "would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator." *State v. Riofta*, 166 Wn.2d 358, 368, 209 P.3d 467 (2009) (emphasis omitted).

This substantive requirement is meant to be "onerous," but it must be "reasonable enough to let legitimate claims survive." *Crumpton*, 181 Wn.2d at 262. While courts should not retry cases when assessing motions for postconviction DNA testing, they should take the trial evidence into account. *Id.* at 263. However, our Supreme Court has recognized that "there will always be strong evidence against a convicted individual since they were convicted of the crime beyond a reasonable doubt." *Id.* at 262. As a result, courts "should not focus on the weight or sufficiency of evidence presented at trial to decide a motion for postconviction DNA testing." *Id.* Instead,

---

[3] At the trial court, the State reserved its right to challenge the procedural requirements in RCW 10.73.170(2), including materiality, but only argued that DNA testing would not show Williams' innocence on a more probable than not basis. On appeal, the State includes one sentence in its introduction that argues DNA testing linking the DNA evidence to a specific person who was not Williams "would not be material to the perpetrator's identity." Br. of Resp't at 2. But the State's statement of the issues does not raise the materiality provision. Instead, the State includes a footnote in its brief waiving the procedural requirements on appeal. And materiality is not argued in any substantive portion of the State's brief. Thus, to the extent the State intended to argue materiality on appeal, it has failed to adequately do so. *See* RAP 10.3(b); *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138, 207 n.37, 560 P.3d 217 (2024), *review granted*, 4 Wn.3d 1020 (2025).

courts "must focus on the likelihood that DNA evidence could demonstrate the individual's innocence in spite of the multitude of other evidence against them." *Id.*

Also, our Supreme Court acknowledged that granting postconviction DNA testing does not decide whether the convicted person will receive a new trial. *Id.* at 263. Rather, once the DNA is tested, a convicted person may move for a new trial based on the results. *Id.* "Obtaining a DNA test is simply the first step on the journey for a new trial." *Id.* The convicted person still must meet the heavy burden required for a new trial. *Id.*

B.      CASES APPLYING RCW 10.73.170

There are several cases that demonstrate how courts have applied the substantive requirement for RCW 10.73.170 motions.

In *Riofta*, a man wearing a white hat got out of a car with other passengers and fired several gunshots at the victim. 166 Wn.2d at 362. The shooter fled the scene and dropped the hat he was wearing. *Id.* When police arrived, the victim identified the shooter as Riofta, whom he had known for several years, and gave a specific physical description of him. *Id.* at 362-63. Police later realized that the car used in the shooting was stolen the night before, and the owner of the car said that the white hat left at the shooting scene belonged to him. *Id.* at 363. After trial, Riofta moved for postconviction DNA testing of the white hat, and the trial court denied the motion. *Id.* at 363-64.

Our Supreme Court held that the trial court did not abuse its discretion by denying Riofta's motion for postconviction DNA testing of the hat and affirmed the trial court. *Id.* at 370. Our Supreme Court relied on the favorable assumptions that Riofta's DNA would be absent from the hat and another individual's DNA would be present on the hat. *Id.* The court determined that

17

these results would not raise a reasonable probability of Riofta's innocence. *Id.* at 373. The shooter only wore the hat for a short time and Riofta's head was shaved, so the absence of Riofta's DNA on the hat would not exclude him as the perpetrator. *Id.* at 370. Additionally, any number of people could have worn the hat at some point after the car was stolen, so the presence of another person's DNA on the hat would not necessarily demonstrate that the person "likely was wearing the hat at the time of the shooting." *Id.* at 371. Accordingly, in the context of other evidence from trial, including the victim's strong eyewitness identification of Riofta, favorable DNA test results would not have raised the likelihood that Riofta could demonstrate his innocence on a more probable than not basis. *Id.* at 373.

In contrast, in *State v. Gray*, Gray was convicted for attacking a group of teenagers on a camping trip and raping one of the girls. 151 Wn. App. 762, 765-66, 215 P.3d 961 (2009). Police tracked Gray's presence near the scene of the crime using scent-tracking dogs, and two of the teenagers identified him as their attacker in one of two photo montages. *Id.* at 766. Gray requested postconviction DNA testing of several pieces of evidence from the scene of the crime, including sexual assault kit swabs from the rape victim. *Id.* at 767. Applying the favorable presumption, Division One of this court concluded that Gray's motion should be granted because if the evidence did not have Gray's DNA but showed another person's DNA, this result would suggest Gray's innocence on a more probable than not basis. *Id.* at 774-75.

Several years after *Gray*, our Supreme Court decided *Thompson*, 173 Wn.2d at 865. In that case, Thompson was convicted of raping and attacking a woman in a hotel room. *Id.* at 867-69. The victim acknowledged that she probably could not identify her attacker and provided a physical description that was inconsistent with Thompson. *Id.* at 868-69. Thompson made a

motion for postconviction DNA testing of the victim's sexual assault kit swabs and the hotel room bedsheets, which both tested positive for the presence of semen. *Id.* at 869-70. The court concluded the motion should have been granted because the record showed that the victim had sexual intercourse with only one person the night of the attack and the victim provided a weak witness identification of her attacker. *Id.* at 875. Thus, "[i]f DNA test results should conclusively exclude Thompson as the source of the collected semen, it is more probable than not that his innocence would be established." *Id.*[4]

After *Thompson*, our Supreme Court decided *Crumpton* and held that the trial court abused its discretion by failing to presume the requested DNA evidence would be favorable to the convicted person. 181 Wn.2d at 263-64. In *Crumpton*, police officers stopped Crumpton half a mile from a house where a woman said she had just been raped multiple times. *Id.* at 256. Crumpton was running and matched the broad description that the woman gave of her attacker. *Id.* Crumpton was also carrying several items from the woman's home. *Id.* Crumpton eventually admitted that he took items from the woman's house but denied raping her. *Id.* at 256-57. Years later, Crumpton moved for postconviction DNA testing of several items of evidence from the crime scene: rectal and vaginal swabs from the victim, the victim's bed sheets, handkerchiefs in the victim's room, and hairs collected from the scene. *Id.* at 257. The trial court denied Crumpton's motion. *Id.*

The *Crumpton* court determined that despite Crumpton's admission that he was in the victim's home, because there was weak identification evidence and "there was only one rapist and

---

[4] While the *Thompson* court concluded the motion should have been granted, the court did not remand the case to the trial court with instructions to grant the motion. 173 Wn.2d at 876.

no other sexual activity, any DNA on the tested evidence would necessarily have to be the rapist's

DNA." *Id* at 261. Thus, exculpatory DNA results from the requested items of evidence would

"directly affect the likelihood Crumpton was innocent," even where there was strong physical and

circumstantial evidence implicating Crumpton. *Id.*

Significantly, while our Supreme Court said that "Crumpton's motion . . . must be granted"

in its discussion as to how *Thompson* and *Gray* were factually analogous, the court did not order

the trial court to grant Crumpton's motion. *Id.* Rather, our Supreme Court demonstrated its

understanding of the role of an appellate court and the role of a trial court by concluding:

> A trial court must look to whether the DNA results, in conjunction with the other evidence from the trial, demonstrate the individual's innocence on a more probable than not basis, assuming the DNA results would be favorable to that convicted individual. The trial court did not use the proper standard, and so it abused its discretion. We reverse and remand to the trial court to apply the proper standard to the motion.

*Id.* at 264.[5]

In sum, Washington cases applying RCW 10.73.170 have required application of a

presumption that further DNA testing will yield results favorable to the convicted person.

Applying that presumption, the trial court must then consider the hypothetical DNA results in

combination with the evidence presented at trial to determine whether the results would create a

reasonable probability of the convicted person's innocence and would demonstrate innocence on

a more probable than not basis. If the trial evidence is such that DNA test results in the convicted

---

[5] Indeed, for this court to remand to the trial court with instructions to grant Williams' motion would alter the standard of review from an abuse of discretion review to a de novo review. An appellate court, in its review of a case, should not consider or decide the case based on the personal circumstances of an individual defendant (e.g., the elderly status of the appellant).

person's favor would not have a reasonable probability of changing the outcome on a more probable than not basis, the motion should be denied. But even where there was significant evidence of guilt presented at trial, the trial court must grant the motion for postconviction DNA testing if, when the presumption is applied, there is a reasonable probability that the convicted person is innocent.

C. SUFFICIENCY OF FINDINGS AND CONCLUSIONS

Williams argues that the trial court abused its discretion by failing to state that it presumed the DNA test results would be favorable to him. Williams also argues that the trial court abused its discretion by failing to state that it assessed whether favorable DNA results would "'raise a *reasonable probability*'" that Williams was not the perpetrator. Br. of Appellant at 45 (quoting *Riofta*, 166 Wn.2d at 368). Williams further contends that because the trial court's ruling did not include factual findings or reasoning, the trial court abused its discretion by failing to consider the impact that presumed favorable DNA test results would have in light of the trial evidence.

The State responds that because the trial court said several times that it read the parties' briefing and case law, which stated the proper legal standards, we can assume it applied those legal standards to Williams' motion. Regarding the presumption of favorable DNA test results, the State attempts to distinguish *Crumpton* because in that case there was "'no indication'" that the trial presumed favorable DNA test results, whereas here the trial court expressly said it read the briefing and case law. Br. of Resp't at 16 (emphasis omitted) (quoting *Crumpton*, 181 Wn.2d at 263).

The State makes a similar argument regarding Williams' contention that the trial court abused its discretion by failing to include factual findings that considered favorable DNA test results in the context of the evidence from trial. The State claims that because the trial court said

21

it reviewed the trial transcripts and concluded that Williams did not meet his burden "'in considering all the other evidence that was presented to this Court by the way of those trial transcripts,'" we can assume that the trial court properly considered the impact of favorable DNA test results in the context of the trial evidence. Br. of Resp't at 18 (emphasis omitted) (quoting VRP (May 10, 2024) at 21).

In his reply brief, Williams contends that when assessing a motion for postconviction DNA testing, a trial court must state the DNA results it is presuming and "identify the relevant trial evidence against which those results are weighed." Reply Br. of Appellant at 4. Williams argues that it was not enough for the trial court to simply say that it reviewed the briefing, case law, and transcripts.

We hold that the record shows that the trial court neither applied the required presumption nor did the court perform the correct legal analysis.

In *Crumpton*, our Supreme Court reversed a trial court's denial of a motion for postconviction DNA testing under RCW 10.73.170 where the trial court "stuck to the statutory language, with no mention of a presumption of favorability or hypothetical inferences from an exculpatory test result." 181 Wn.2d at 263. Here, the trial court also did not mention a presumption of favorable DNA test results or discuss how those presumed results would interact with the trial evidence. Like in *Crumpton*, the trial court here only used the statutory language from RCW 10.73.170, concluding without explaining that it did not believe Williams showed "that there's a likelihood the DNA evidence would demonstrate innocence on that more probable than not basis." VRP (May 10, 2024) at 21. Contrary to the State's contention, the *Crumpton* court did not suggest that review of the parties' arguments about the presumption would be enough to show

22

that the trial court adequately considered the presumption, and the State points to no such suggestion in any of the case law addressing postconviction DNA testing.

Moreover, our Supreme Court has made it clear that the trial court must do more than weigh the evidence of guilt presented at trial against favorable DNA test results. The trial court must apply the presumption and then assess whether hypothetical DNA test results favorable to the defendant would raise a reasonable probability of innocence in light of the other evidence presented at trial. *Riofta*, 166 Wn.2d at 368-69. Here, the trial court's oral ruling and written order show that the trial court reached conclusions without the trial court engaging in the proper analysis.

Williams also contends that the trial court abused its discretion by stating in its ruling that "'while the State didn't go through and test every single thing, I don't know that anybody provided any authority to suggest that the State needed to have done that.'" Br. of Appellant at 39 (quoting VRP (May 10, 2024) at 21). Williams argues that this incorrectly imposed a burden on him to show that the evidence should have been tested prior to trial.

The trial court's statement about what the State could or should have done at trial, at best, appears to address the procedural requirement outlined in RCW 10.73.170(2)(a)(iii), which states that postconviction DNA testing motions must explain that the requested testing "would provide significant new information." Again, neither party contests that the procedural requirements were met here. And to the extent the trial court considered whether the State could or should have tested the requested evidence in its *substantive* assessment of Williams' motion, such analysis would be improper and not relevant to determining whether Williams has shown "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

23

Here, a favorable test result would be the absence of Williams' DNA from the requested evidence and the presence of another person's DNA on all the items of evidence. *See, e.g.*, *Gray*, 151 Wn. App. at 774 (making a similar favorable presumption). Even accounting for Budlong's interactions with other people before and in the aftermath of the assault, it is unlikely that an innocent person's DNA would appear on the requested pieces of evidence that tie the perpetrator to the multiple locations.[6] It is also unlikely that the perpetrator's DNA would not appear in *any* of these locations—particularly on swabs from Budlong's clothing and under her fingernails after the assault when Budlong's broken finger and forearms suggest a violent struggle between Budlong and her attacker. Thus, a result where all the items of evidence Williams seeks to test show the presence of another person's DNA *and* the absence of Williams' DNA would raise a reasonable probability that Williams was not the perpetrator and make it likely that such DNA evidence would demonstrate innocence on a more probable than not basis.

Despite the State's arguments otherwise, *Riofta* is distinguishable from this case. The court in *Riofta* noted that a favorable DNA result would not sufficiently demonstrate the likelihood of Riofta's innocence because there was significant evidence at trial, including the victim's identification of Riofta as the shooter by name and appearance, that showed Riofta's guilt

---

[6] Although Williams was not charged with sexual assault, police initially were concerned about sexual assault because of Budlong's state of dress when they found her and the gaps in her memory. If testing revealed another person's DNA on Budlong's sexual assault kit swabs in addition to the other requested pieces of evidence that connect the perpetrator to the scene of the assault and Budlong's truck, that result would be relevant to the identity of the perpetrator, even if Budlong did have sexual intercourse with somebody other than Williams during the relevant time period. Thus, the DNA results from Budlong's sexual assault kit, in combination with the other DNA results, would be relevant to establishing Williams' innocence on a more probable than not basis, regardless of whether he was charged with sexual assault.

regardless of the DNA results from the hat. 166 Wn.2d at 370-72. Unlike here, Riofta only sought DNA testing for one item of evidence connecting the perpetrator to the crime, which occurred in a single location. *Id.* at 362, 367. Thus, the favorable inferences from that evidence are less compelling than those here, where a favorable DNA result would demonstrate another person's connection to several locations and aspects of the charged crimes.

Additionally, had the trial court applied the proper legal standard, it likely would have determined that favorable DNA test results would raise a reasonable probability that Willaims was not the perpetrator. The evidence at trial shows that during their investigation, police did not find an item matching the description of the metal bar or spray can that witnesses saw in Budlong's truck after the crash. And Williams' ring, which the police collected because they initially thought it would match a mark on Budlong's shoulder, did not have Budlong's DNA and did not match the size of the injury. Additionally, the witness identifications in this case were weak: no witness could specifically identify Williams at any location associated with the crime. And there was some confusion about the Nissan car model that Hernandez-Morenos initially told police he saw at the scene of the truck crash. Hernandez-Morenos also thought the man he saw was younger than Williams. Budlong herself could not remember her attacker, and when she was initially awake at the hospital, she identified the attacker as a white man. Budlong also said Williams was not her attacker. This evidence could raise a reasonable probability of Williams' innocence when combined with favorable DNA test results.

Williams' cuts at the time of his arrest and the blood evidence found in his Infiniti after his arrest do not negate the impact of favorable DNA test results. There was no blood in Budlong's truck, Williams provided another explanation for his cuts, and more than one officer testified they

did not see the cuts on Williams or the bloodstains in the Infiniti on June 1. Additionally, the use of Williams' keycard to access the campground the night of the attack does not necessarily demonstrate Williams' guilt because he could have lent the keycard to the friend who was staying with him. Thus, this evidence could also raise a reasonable probability of Williams' innocence when combined with favorable DNA test results.

Finally, while Budlong's bloodstained receipt is significant evidence tying Williams to Budlong's assault, Williams challenged the circumstances around the discovery of that receipt. Given the strength of the inferences from favorable DNA testing of the requested items in this case, this evidence does not negate the likelihood that favorable results would show Williams' innocence on a more probable than not basis.

### CONCLUSION

We reverse and remand to the trial court to apply the proper legal analysis in determining Williams' motion for postconviction DNA testing.

Lee, J.

I concur:

Veljacic, A.C.J.

GLASGOW, J. (concurring and dissenting)—I concur with the majority's conclusion that the trial court erred when it denied Williams' motion for DNA testing because it failed to expressly apply the required presumption that DNA testing would return results favorable to Williams. I dissent in part because unlike the majority, I would follow what the Washington Supreme Court has uniformly done in this situation. I would consider the evidence presented at trial, presume favorable DNA results, and determine whether that favorable DNA evidence would demonstrate Williams' innocence on a more probable than not basis. Here, reasonable minds can only conclude that it would. I would therefore direct the trial court to order postconviction DNA testing on remand, just as the Washington Supreme Court did in *State v. Crumpton*, 181 Wn.2d 252, 261, 263-64, 332 P.3d 448 (2014). Doing so would avoid an unnecessary and unjust delay of DNA testing that Williams, who is now elderly, is entitled to.

In every case where the Supreme Court has reversed the trial court's denial of DNA testing, the Supreme Court has engaged in its own fact-specific application of the substantive requirement outlined in the postconviction DNA testing statute. The Supreme Court has then made a determination as to whether the trial court should have ordered DNA testing. The Supreme Court engaged in this substantive analysis even when it determined that the trial court had applied an improper legal standard or made an evidentiary error below.

In *State v. Thompson*, the Washington Supreme Court acknowledged that the trial court made an evidentiary error by denying Thompson's motion for postconviction DNA testing because the trial court had improperly considered a statement that was not admitted as evidence during trial. 173 Wn.2d 865, 874, 271 P.3d 204 (2012). The *Thompson* court did not simply remand for the trial court to reevaluate using only the proper evidence. Instead, the Supreme Court went a step

further, applying the substantive test to the properly admitted evidence and concluding that the postconviction DNA testing motion should have been granted. *Id.* at 874-75. Specifically, the Supreme Court concluded Thompson had shown the likelihood that DNA evidence would demonstrate his innocence on a more probable than not basis. *Id.* at 875.

More analogous to Williams' case, in *Crumpton*, the Washington Supreme Court held that the trial court abused its discretion by not adequately showing that it had presumed the requested DNA test results would be favorable to Crumpton. 181 Wn.2d at 263-64. The Supreme Court reversed and remanded the case to the trial court to apply the proper standards to Crumpton's motion. *Id.* at 264. However, the Supreme Court also engaged in the proper substantive analysis and expressly concluded that, applying the proper favorable presumption, "Crumpton's motion for testing must be granted." *Id.* at 261.

Thus, when reversing the denial of postconviction DNA testing, the Washington Supreme Court has uniformly analyzed whether a convicted person has met the substantive requirement of the postconviction DNA testing statute, even where it first held the trial court made an evidentiary error or applied the wrong legal test. This makes sense because in an evaluation of whether postconviction DNA testing should be granted, a court relies on the evidence presented at trial and the presumption of favorable DNA results. There is no presentation of new evidence, so the trial court is in no better position than the appellate court to apply the correct legal standard to the facts in the record.

Here, considering the evidence presented at trial and presuming favorable DNA test results as we must, we can see that it would be an abuse of discretion to deny Williams' motion for DNA testing. As the majority correctly reasons, it is unlikely that an innocent person's DNA would

appear on *all* the requested pieces of evidence that tie the perpetrator to the multiple locations associated with the assault. And, where Budlong's struggle against her attacker was so violent that both of her arms were broken, it is similarly unlikely that the perpetrator's DNA would appear on none of these pieces of evidence, particularly the swabs from her clothing and from under her fingernails.

Additionally, presuming favorable DNA test results, the evidence presented at trial does not negate the likelihood of Williams' innocence on a more probable than not basis. Police did not find the metal bar seen in Budlong's truck, and Williams' ring did not have Budlong's DNA. In addition, no witness, including Budlong herself, identified Williams as the attacker. In fact, Budlong, who had dated Williams for almost a decade, initially said that Williams was not her attacker and instead identified the attacker as a white man. Then her injuries interfered with her memory of the incident.

While police eventually found bloodstains from Williams in his Infiniti, there was no blood in Budlong's truck and officers did not see blood in the Infiniti when they searched it the day after the assault. Williams explained that the cuts police saw on the day of his arrest were from an innocuous fall, and importantly, several officers did not notice any cuts when speaking to Williams in the days just after the assault. Finally, because it was not part of the evidence depicted in the photographs of evidence taken from Williams' car, the bloodstained gas station receipt alone does not sufficiently demonstrate Williams' guilt under the applicable standard. Accordingly, favorable DNA results, when combined with the evidence presented at trial, would raise a reasonable probability of Williams' innocence.

As a result, following the Washington Supreme Court's example and applying the substantive requirement for postconviction DNA testing to the facts of this case, we should conclude that Williams is entitled to the DNA testing he requests.

Williams was in his 60s when Budlong was assaulted in 2007, so now, almost 20 years later, he is elderly. Requiring the trial court to hold another hearing and apply the correct standard to determine whether Williams is entitled to DNA testing could result in another appeal of the court's decision, all before DNA testing actually occurs. That potential delay is pointless if no new evidence will be taken on remand and we can conclude on this record that it would be an abuse of discretion to deny the DNA testing. That is the case here.

Given Williams' age, we risk entirely denying him the justice he seeks by unnecessarily delaying the postconviction DNA testing he is entitled to. We should not require the trial court in this case to engage in further analysis of Williams' motion. I would reverse the trial court's denial of Williams' motion and instruct the trial court to grant the motion. As a result, I respectfully dissent in part.



GLASGOW, J.